Miguel PEREZ–RUBIO and Teresa Arrastia Perez–Rubio, as Individuals, and on behalf of themselves as the shareholders of Four Aquarius Limited, and in the Right of Four Aquarius Limited, in its behalf as a shareholder of Aquarius One Hundred Limited and One Hundred Aquarius Limited and in the Right of Aquarius One Hundred Limited and One Hundred Aquarius Limited, Plaintiffs,

v.

E. Lisk WYCKOFF, Jr., Trubin Sillcocks Edelman & Knapp, a partnership, Kelley Drye & Warren, a partnership, Conyers, Dill & Pearman, a partnership, H.C. Butterfield, Charles T.M. Collis, C.F. Alexander Cooper, Nicholas B. Dill, John A. Ellison, North Rock Enterprises Limited, Pembroke Company Limited, J. Douglas Robinson, Joseph V. Ossorio, the Bank of Nova Scotia Trust Company (Cayman) Limited, Royan D. Ellis, Kenneth Kent Pritchard, Edward C. Warwick, Sherwin B. Abrams, Marvin V. Ausubel, Lester S. Bardack, Charles R. Bergoffen, Lester M. Bliwise, Thomas J. Dee, Albert I. Edelman, Philip M. Eisenberg, Gerald M. Freedman, John Gutheil, Lewis R. Kaster, Russell S. Knapp, Lola S. Lea, Edward A. Manuel, Martin Pomerance, Paul E. Roberts, H. Jackson Sillcocks, Abraham M. Stanger, John Trubin, Robert S. Warshaw and P. Bruce Wright, Defendants.

No. 84 Civ. 8229(RJW).

United States District Court, S.D. New York.

Aug. 10, 1989.

subel, Lester S. Bardack, Charles R. Bergoffen, Lester M. Bliwise, Thomas J. Dee, Albert I. Edelman, Philip M. Eisenberg, Gerald M. Freedman, John Gutheil, Lewis R. Kaster, Russell S. Knapp, Lola S. Lea, Edward A. Manuel, Martin Pomerance, Paul E. Roberts, H. Jackson Sillcocks, Abraham M. Stanger, John Trubin, Robert S. Warshaw and P. Bruce Wright.

Coudert Bros., New York City, Jerry L. Siegel, Michael J. Calvey, John E. McDermott, Jr., Kevin W. Goering, Andrew M. Gold, of counsel, for defendants Conyers, Dill & Pearman, H.C. Butterfield, Charles T.M. Collis, C.F. Alexander Cooper, Nicholas B. Dill, Jr., John A. Ellison, North Rock Enterprises Ltd., Pembroke Co. Ltd. and J. Douglas Robinson.

Shearman & Sterling, New York City, George J. Wade, James P. Tallon, Maria M. Patterson, of counsel, for defendant The Bank of Nova Scotia Trust Co. (Cayman) Ltd., Royan D. Ellis, Kenneth Kent Pritchard and Edward C. Warwick.

Spengler, Carlson, Gubar, Brodsky & Frischling, New York City, Edward Brodsky, Thomas H. Sear, Lawrence R. Gelber, Seth H. Agata, of counsel, for defendant Kelley Drye & Warren.

## OPINION

ROBERT J. WARD, District Judge.

Miguel and Teresa Perez–Rubio (collectively referred to as the Perez–Rubios) brought this action asserting violations of the federal securities laws, of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), and of various state laws. Defendants moved to dismiss the complaint pursuant to Rules 12(b)(6) and 9(b), Fed.R.Civ.P. In addition, certain defendants challenge, pursuant to Rule 12(b)(2), the Court's personal jurisdiction over them. The motions were referred to the Honorable Ruth V. Washington, United States Magistrate, pursuant to 28 U.S.C. § 636(b)(1) and Rule 4 of the Local Rules for Proceedings before Magistrates, to hear and report. On June 3, 1987 Magistrate Washington filed her Report and Recommendation (the "Report"), in which she

Murray, Hollander, Sullivan & Bass, New York City, Daniel J. Sullivan, James M. Minamoto, Helene Rothenberg, Eric B. Levine, of counsel, for plaintiffs.

Donovan, Leisure, Newton & Irvine, New York City, Owen McGivern, J. Peter Coll, William J. Ruane, of counsel, for defendant E. Lisk Wyckoff, Jr.

Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, Edward J. Boyle, Steven Kent, Raymond J. Dorado, Nancy F. Shapiro, John Diviney, of counsel, for defendants Trubin, Sillcocks, Edelman & Knapp, Sherwin B. Abrams, Marvin V. Au-

recommended that defendants' motions to dismiss the securities fraud claims and the RICO claims be granted. Plaintiffs' time to file objections to the Report was extended. The Court has reviewed the Report and has considered *de novo* those portions to which plaintiffs have objected. For the reasons hereinafter stated, the Court declines to adopt the magistrate's recommendation and grants defendants' motions only in part.

## BACKGROUND

For the purpose of deciding defendants' motions to dismiss, the allegations contained in plaintiffs' amended complaint are taken as true. *Dwyer v. Regan*, 777 F.2d 825, 827 (2d Cir.1985). The Perez–Rubios, who are citizens of the Republic of the Philippines, sought to invest in American securities. Beginning in 1974, Joseph C. Ossorio, who was then a principal in the New York Stock Exchange firm of Platt, Shaw & Ossorio, Inc. ("PS & O"), convinced the Perez–Rubios and a number of other foreign investors to provide funds for investment in the United States. Amended Complaint ¶ 9. E. Lisk Wyckoff explained to the investors, in some cases directly and otherwise through Ossorio, that they could invest their money in the United States and avoid paying United States taxes if title to the investments was to be held by one or more off-shore corporations. Wyckoff acted as the investors' attorney in the formation of the companies, while he also represented Ossorio and PS & O, who would be managing the investments. *Id.* ¶ 14. In or about March 1974, Wyckoff, acting in his capacity as agent for the investors, retained the Bermuda law firm of Conyers, Dill & Pearman ("Conyers Dill")[1] and oth-

ers to incorporate and manage a series of companies to hold title to the foreigners' investments. The companies were named respectively Aquarius One Limited, Aquarius Two Limited, etc. *Id.* ¶ 15. At least nine of these companies were established. *Id.* ¶ 17. Collectively, these companies are referred to as the Bermuda Aquarius Companies.

On or about April 11, 1974, the Perez–Rubios, acting on Ossorio's advice, retained PS & O. *Id.* ¶ 22. Wyckoff, as attorney for the Perez–Rubios and at Ossorio's request, formed Aquarius Four, Ltd. ("Aquarius 4") in Bermuda, to facilitate the Perez–Rubios' investment in American securities. Wyckoff undertook this assignment in May of 1974 and the corporation was formed on or about March 21, 1975. *Id.* ¶¶ 23, 24. The Perez–Rubios made an initial investment of $270,058 early in 1975; later, on separate occasions in 1975 and 1976, they made further investments of $25,000, $3,495 and $100,000. *Id.* ¶¶ 26, 27.

At Wyckoff's and Ossorio's instance, the Bermuda Aquarius Companies, including Aquarius 4, engaged PS & O as investment advisors, authorized PS & O to trade securities on their behalf, and issued general powers-of-attorney. *Id.* ¶¶ 16, 25.

In 1975, after Ossorio had left PS & O to join Drysdale & Company,[2] he engaged Wyckoff to represent Drysdale. At Ossorio's and Wyckoff's instance, in or about May or June of 1975, the Bermuda Aquarius Companies terminated their agreements with PS & O; they engaged Drysdale as their investment advisor, gave Drysdale their trading authorization, and executed general powers-of-attorney to Ossorio. *Id.* ¶¶ 18, 28, 30.

**1.** In addition to Conyers Dill itself, plaintiffs have named as defendants in this action the partners of Conyers Dill. These are H.C. Butterfield, Charles T.M. Collis, C.F. Alexander Cooper, Nicholas B. Dill, Jr. and John A. Ellison. The Conyers Dill partners served in various capacities as officers, directors and shareholders of Aquarius 4 and Aquarius 100. North Rock Enterprises, Inc. ("North Rock"), which provided management services to Aquarius 4 and Aquarius 100, was wholly owned by Conyers Dill. Pembroke Company Ltd. ("Pembroke"), also owned by Conyers Dill, was the registered

owner at all relevant times of 11,996 of the 12,000 outstanding shares of Aquarius 4. J. Douglas Robinson served as managing director of North Rock and as secretary of both Aquarius 4 and Aquarius 100. These defendants will be referred to collectively as the Conyers Dill defendants.

**2.** Drysdale & Co. was later reorganized as Drysdale Securities Corp. Amended Complaint ¶ 18. These entities will be referred to interchangeably as "Drysdale."

In or about January of 1976, Wyckoff became a member of Trubin, Sillcocks, Edelman & Knapp ("Trubin Sillcocks")[3] and arranged for Trubin Sillcocks to take over the representation of Ossorio, Drysdale and the Bermuda Aquarius Companies, including Aquarius 4. *Id.* ¶¶ 19, 30.

On or about August 2, 1976, Wyckoff arranged for the management of Aquarius 4 and the other Bermuda Aquarius Companies to be transferred to Conyers Dill, with the appointment of Conyers Dill partners as officers and directors of the companies. *Id.* ¶ 30.

In or about May and June of 1976, Wyckoff had arranged for the formation of Aquarius One Hundred Limited ("Aquarius 100"), which was managed by Conyers Dill. *Id.* ¶ 31. Ossorio, with the assistance of Wyckoff, used Aquarius 100 to pool the assets of the various Bermuda Aquarius Companies, including Aquarius 4. Each of the Bermuda Aquarius Companies was to have a beneficial interest in Aquarius 100 in proportion to its contribution to Aquarius 100's total assets. *Id.* ¶ 32.

At Wyckoff's request, the directors of Aquarius 100, who were partners of Conyers Dill, resolved that Ossorio's sole signature on any contract, check, bill of exchange, promissory note or other negotiable instrument would bind Aquarius 100. *Id.* ¶ 33. The directors executed a series of documents, all dated July 15, 1976, giving Drysdale and Ossorio broad authority to trade on behalf of Aquarius 100. Drysdale was authorized to open a corporate account in the name of Aquarius 100, and was authorized to trade in securities and commodities, including margin transactions, short sales and option transactions of any kind. Ossorio was authorized to buy, sell and trade securities, commodities and options with the privilege to withdraw money and/or securities from the account. A loan

consent agreement authorized Drysdale to lend any securities held by Drysdale to itself or to others. *Id.* ¶ 34.

By 1976, Drysdale was experiencing financial difficulties, of which the Perez–Rubios were unaware. In that same year, Ossorio began to manipulate the Aquarius accounts and even to embezzle cash and securities from them, all to the benefit and gain of either Drysdale or himself. *Id.* ¶ 35. Aided and abetted by Wyckoff, Ossorio devised a scheme to use the assets of the Bermuda Aquarius Companies that had been transferred to the account of Aquarius 100, including those of the Perez–Rubios, to shore up Drysdale's capital position and to keep the New York Stock Exchange satisfied as to Drysdale's viability. *Id.* ¶ 36. Within the space of two months, between November 26, 1976 and January 14, 1977, Wyckoff and Ossorio caused Aquarius 100 to loan to Drysdale or to Ossorio individually an aggregate amount in excess of one million dollars. *Id.* ¶ 37. The money loaned to Ossorio was then re-loaned to Drysdale and could thus be shown as part of Drysdale's equity. These transactions were carried out without the knowledge or consent of the beneficial owners, and without any commensurate benefit conferred upon them. *Id.* ¶ 36. In exchange for the loans, Aquarius 100 received promissory notes from Drysdale. These transactions were later ratified by the Conyers Dill defendants. *Id.* ¶ 38. Throughout 1977 and 1978 an additional two million dollars was loaned to Ossorio and Drysdale from funds belonging to Aquarius 100. *Id.* ¶¶ 39–42.

On or about May 1, 1978, J. Douglas Robinson of Conyers Dill, in his capacity as secretary of both Aquarius 4 and Aquarius 100, waived the protection provided by Rule 11A2–2(T) of the Securities and Exchange Commission, 17 C.F.R.

---

**3.** In addition to Wyckoff and Trubin Sillcocks itself, plaintiffs have named as defendants individuals who were partners to Trubin Sillcocks between January 1976 and September 1979. These include: Sherwin B. Abrams, Marvin V. Ausubel, Lester S. Bardack, Charles R. Bergoffen, Lester M. Bliwise, Thomas J. Dee, Albert I. Edelman, Philip M. Eisenberg, Gerald M. Freed-man, John Gutheil, Lewis R. Kaster, Russell S. Knapp, Lola S. Lea, Edward A. Manuel, Martin Pomerance, Paul E. Roberts, H. Jackson Sillcocks, Abraham M. Stanger, John Trubin, Robert S. Warshaw and P. Bruce Wright. These defendants will be referred to collectively as the Trubin Sillcocks defendants.

§ 240.11a2–2(T).[4] *Id.* ¶ 44. Likewise, on or about May 30, 1978 Robinson executed documents prepared by Wyckoff that waived, with respect to certain of the conflict-of-interest loans, the protections ordinarily available under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–78*lll* ("SIPC"). Absent the waiver of SIPC protection, officials from the New York Stock Exchange were unwilling to treat the loans by Aquarius 100 to Drysdale as part of Drysdale's capital. *Id.* ¶ 45. Within a period of less than two years, Ossorio, aided and abetted by the actions and inaction of Wyckoff, the Trubin Sillcocks defendants and the Conyers Dill defendants, had caused over $3,000,000 in credit, cash and securities to be committed under conditions that provided virtually no protection against loss. *Id.* ¶ 47.

Pursuant to Wyckoff's instructions contained in letters dated June 17, 1976 and November 7, 1977, the Conyers Dill defendants sent all correspondence and documents relating to the Aquarius Companies to Wyckoff only. No papers were sent to the individual stockholders. *Id.* ¶ 48. At Wyckoff's direction, the financial statements of Aquarius 4 and 100 were kept by Ossorio and/or Drysdale. The Conyers Dill defendants never obtained audited financial statements, and, contrary to the requirements of Bermuda law and the bylaws of the companies, financial statements were never presented to any of the annual meetings of the companies. *Id.* ¶ 49.

In November 1978, in order to avoid the requirements of Bermuda law to provide audited financial statements and in anticipation of an investigation by the Securities and Exchange Commission, Wyckoff entered into an agreement with the Bank of Nova Scotia Trust Company ("BNST"),[5] whereby BNST would incorporate a series

of corporations in the Cayman Islands designated One Aquarius Limited, Two Aquarius Limited, etc., including Four Aquarius Limited ("4 Aquarius") and One Hundred Aquarius Limited ("100 Aquarius"), to assume the assets of the Bermuda Aquarius Companies bearing the mirror-image names. *Id.* ¶ 52. BNST, which provided the Cayman Island Aquarius Companies with management services, gave Drysdale and Ossorio the same broad trading authority they had exercised over the Bermuda Companies, without having received any authorization from the beneficial owners. *Id.* ¶¶ 53, 54.

In their management of the Cayman Islands Aquarius Companies, the BNST defendants did not adequately protect the interests of the beneficial owners. Thus, on or about November 15, 1978, the BNST defendants executed a demand promissory note, prepared by Wyckoff, to the Perez–Rubios on behalf of 4 Aquarius, in the amount of $395,002. The security provisions made in connection with the note, however, were manifestly inadequate to protect the Perez–Rubios. *Id.* ¶ 55. Defendant Ellis, at Wyckoff's instruction and without the knowledge or consent of the Perez–Rubios, waived the protection of SEC Rule 11A2–2(T) on behalf of 4 Aquarius, just as the Conyers Dill defendants had done for Aquarius 4. *Id.* ¶ 57. Thereafter, the BNST defendants held themselves out as officers, directors and managers of the Cayman Island Aquarius Companies, without taking any reasonable steps to investigate whether the assets of the corporations were as represented or whether they existed at all, and without taking any further steps to protect security interests on loans by 100 Aquarius to Drysdale and Ossorio. *Id.* ¶ 58.

**4.** Rule 11A2–2(T) prohibits a member of a national securities exchange from effecting a transaction on that exchange for an account with respect to which it exercises investment discretion and at the same time being compensated for the transaction unless the person or persons authorized to transact business for the account have expressly and in writing waived the rule. The rule was designed in part to prevent investment advisors who also trade the investor's securities from being compensated on

a transaction basis and thus to discourage them from churning the account for their own gain.

**5.** Plaintiffs have sued, in addition to BNST, employees of BNST who served as directors and/or officers of 4 Aquarius. These are Royan D. Ellis, Kenneth Kent Pritchard and Edward C. Warwick. These defendants are hereinafter referred to collectively as the BNST defendants.

Ossorio, on several occasions represented to the Perez–Rubios that their funds were being invested conservatively, and he provided the Perez–Rubios with account statements that purported to show that their investments were regularly appreciating. *Id.* ¶ 60. In September of 1979, Wyckoff left Trubin Sillcocks to join Kelley, Drye & Warren ("Kelley Drye"). Wyckoff continued to act as attorney for the Perez–Rubios and other beneficial owners of the Aquarius Companies, and for Ossorio and Drysdale. *Id.* ¶¶ 20, 71.

After the Cayman Islands Aquarius Companies were created, in order to avoid the requirements of Bermuda law and in anticipation of investigations by the NYSE and SEC, Wyckoff and Ossorio undertook to liquidate the Bermuda Aquarius Companies. The necessary documents to accomplish the liquidation were prepared by Wyckoff and/or by Trubin Sillcocks, and executed by Ossorio. *Id.* ¶ 66. On or about January 17, 1978, defendant Dill was appointed liquidator of the Bermuda Aquarius Companies. *Id.* ¶ 68. In February 1981, based on Wyckoff's assurances that they were profiting in their investments, the Perez–Rubios executed, among other documents, an indemnification to Dill as liquidator of Aquarius 4. *Id.* ¶ 76. Thereafter, on or about September 1, 1981, Aquarius 4 and other of the Bermuda Aquarius Companies were liquidated. As of the date of the amended complaint, Aquarius 100 remained unliquidated. *Id.* ¶ 77.

On June 15, 1982, Ossorio announced that Drysdale would cease doing business and withdraw its NYSE membership. *Id.* ¶ 78. The United States Attorney's Office for the Southern District of New York, the Manhattan District Attorney and the Securities and Exchange Commission each undertook investigations. *Id.* ¶ 79. On March 31, 1983, Ossorio pleaded guilty to three counts of federal securities fraud, including one count charging with respect to the Aquarius 100 account. *Id.* ¶ 80. Ossorio was also indicted by a New York County Grand Jury for conspiracy, fraud, grand larceny, issuing false financial statements and violating section 352–c of the New York General Business Law. *Id.* ¶ 82. Ossorio, who was sentenced to eight years imprisonment on the three counts of federal securities fraud and two and a third to seven years on related New York State charges, has also been ordered to make restitution of $10 million to foreign investors and $290 million to injured banks. *Id.* ¶¶ 83, 84.

Claims one and two of the amended complaint assert violations of the federal securities laws. Claims three, four and five assert violations of the federal Racketeer Influenced and Corrupt Organizations Act. Claims six through twelve assert various causes of action based on state law.

Defendants E. Lisk Wyckoff and Kelley Drye have moved, pursuant to Rules 12(b)(6) and 9(b), Fed.R.Civ.P., to dismiss the amended complaint for failure to state a claim and failure to plead fraud with particularity. The BNST defendants have likewise moved pursuant to Rule 12(b)(6), and for summary judgment pursuant to Rule 56, Fed.R.Civ.P.[6] The Trubin Sillcocks defendants have moved pursuant to Rule 12(b)(6), contending that plaintiffs' RICO claims are time-barred and that plaintiffs have failed to allege a federal cause of action. The Conyers Dill defendants have moved pursuant to Rule 12(b); they challenge the Court's personal jurisdiction over them, and they argue that no derivative action may be brought on behalf of Aquarius 100.[7]

---

**6.** Although the BNST defendants have denominated their motion as having been brought under Rule 56, Fed.R.Civ.P., it is more properly construed as having been brought pursuant to Rules 12(b)(2) and 12(b)(5), inasmuch as the BNST defendants are challenging the Court's personal jurisdiction over them and the sufficiency of process. Although it would be proper, in the context of a Rule 56 motion, to determine the Perez–Rubios' capacity to bring a derivative action on behalf of 4 Aquarius and 100 Aquarius, this challenge is now moot. *See* note 15, infra.

**7.** The Court refers to Wyckoff, the Trubin Sillcocks defendants, Kelley Drye, the Conyers Dill defendants and the BNST defendants, collectively, as the moving defendants.

## DISCUSSION

 To accept the report and recommendation of a magistrate to which no timely objection has been made, a District Court need only satisfy itself that there is no clear error on the face of the record. *See* Rule 72, Fed.R.Civ.P., Notes of Advisory Committee on Rules (citing *Campbell v. United States District Court,* 501 F.2d 196, 206 (9th Cir.), *cert. denied,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974)). However, when timely objection has been made to a portion or portions of a magistrate's report, the District Judge must "make a *de novo* determination ... of any portion of the magistrate's disposition to which specific written objection has been made." Rule 72(b), Fed.R.Civ.P.; *see also* 28 U.S.C. § 636(b)(1). The Judge may then accept, reject, or modify, in whole or in part, the magistrate's proposed findings and recommendations. 28 U.S.C. § 636(b)(1).

A District Court's obligation to make a *de novo* determination of properly contested portions of a magistrate's report does not require that the Judge conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 (1980). It is sufficient that the District Court "arrive at its own, independent conclusion about those portions of the magistrate's report to which objection is made." *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983). To this end, the Court must "exercise ... sound judicial discretion with respect to whether reliance should be placed on [the magistrate's] findings." *American Express Int'l Banking Corp. v. Sabet,* 512

F.Supp. 472, 473 (S.D.N.Y.1981), *aff'd without opinion,* 697 F.2d 287 (2d Cir.), *cert. denied,* 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982).

In the instant case, plaintiffs have filed timely written objections to the magistrate's Report. The Court has reviewed *de novo* those portions of the Report to which plaintiffs' objections pertain.

### A. Personal Jurisdiction over the BNST and the Conyers Dill Defendants

 On a motion to dismiss pursuant to Rule 12(b)(2), Fed.R.Civ.P., all pleadings and affidavits are construed in the light most favorable to the plaintiff and all doubts are to be resolved in the plaintiff's favor. *Cutco Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986); *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir.1985). To withstand a motion to dismiss, a plaintiff need make out only a *prima facie* case of personal jurisdiction. *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 768 (2d Cir.1983).

 Both the Conyers Dill defendants and the BNST defendants challenge the Court's personal jurisdiction over them.[8] Personal jurisdiction is asserted over each of the defendants pursuant to section 27 of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78aa, which extends personal jurisdiction to the full reach permitted by the due process clause. *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326, 1339, 1340 (2d Cir. 1972). Thus, jurisdiction can be obtained over any defendant who has "certain mini-

8. In addition, the BNST defendants have challenged the sufficiency of service upon them. Section 27 of the 1934 Act permits extraterritorial service of process, even outside the United States. *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326, 1340 (2d Cir.1972). Plaintiffs originally attempted to effect service of the summons and complaint upon the BNST defendants by mail, directed to the Bank of Nova Scotia, which is a separate entity with offices in the same building as BNST on Grand Cayman Island. A mailroom employee at Bank of Nova Scotia routed the packages to BNST. Subsequently, personal service was effected upon defendants Pritchard, Warwick, and upon BNST itself. Accordingly, any argument by

these defendants regarding the sufficiency of service is now moot. The papers filed with the Court, however, give no indication that Ellis has been personally served. Service by mail sent to the Bank of Nova Scotia does not comply with the applicable rules, and is not reasonably calculated to provide actual notice. Plaintiffs are directed to complete service upon defendant Ellis. If service is not completed by October 13, 1989, this action will be dismissed as against defendant Ellis in accordance with Rule 4(j), Fed.R.Civ.P. Because Ellis has not at this time been properly served, the Court declines to determine whether his contacts with the forum are sufficient for the Court to assert personal jurisdiction over him.

mum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)). In an action such as this, brought under the federal securities laws and RICO, the jurisdictional inquiry focuses on a defendant's contacts with the United States as a whole, not merely with the forum State. *Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir.1974).

■ Under the due process clause, personal jurisdiction may be asserted over an individual who is not present, where the defendant is (1) doing business in the state, (2) doing an act in the state, or (3) causing an effect in the state by an act done elsewhere. *Leasco Data Processing Equip. Corp. v. Maxwell, supra,* 468 F.2d at 1340 (citing Restatement (Second) of Conflict of Laws §§ 27, 35–37 (1971)). The third ground must be applied with caution, particularly in an international context. "The person sought to be charged must know, or have good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him." *Id.* at 1341. It is not enough that causing an injury in the forum may be foreseeable, within the meaning of proximate causation and tort liability; rather, "the foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295, 100 S.Ct. 559, 566, 62 L.Ed.2d 490 (1980).

### 1. *The BNST Defendants*

The Court will consider first the question of its personal jurisdiction over BNST itself, and then over the individual BNST defendants, Warwick and Pritchard.

BNST maintains neither an office nor any personnel in the United States. It does not advertise in American newspapers or magazines. Affidavit of Edward C. Warwick, filed March 18, 1985 ¶¶ 11, 12 ("Warwick Aff."). Asserting that BNST is indeed doing business in the United States, plaintiffs point to a custodial securities account maintained by BNST with the Bank of Nova Scotia's New York agency.[9] BNST holds assets of approximately $49,000,000 in this account. Of this amount, approximately $45,000,000 represents trust assets; the remainder, approximately $4,000,000, represents managed assets. *Id.* ¶ 8. The trust assets are held in street name and invested by BNST, for the beneficiaries, in accordance with investment powers contained in the trust instruments. Such investments are sometimes made upon advice of professional investment advisors and sometimes made upon BNST's own discretion. The managed assets are invested by BNST solely on the instructions of its principals or their duly authorized agents. *Id.*

Stock trading for BNST is carried out by brokers in New York and, infrequently, by a San Francisco broker on the Los Angeles Stock Exchange. Such trading is performed on the basis of telephone and telex instructions from the Cayman Islands. The majority of these trades are for the account of non-United States citizens. *Id.* ¶ 9.

BNST provides "representation" services to sixty-four banks. For some of these banks, BNST also provides bookkeeping services in that it keeps records based on information sent into the Cayman Islands by these banks regarding their transactions in the United States and elsewhere for the account of their Cayman branches. *Id.* ¶ 10.

■ When the cause of action does not arise out of or relate to the defendant's

---

9. In addition, BNST maintains an account in New York, with the Bank of Nova Scotia's New York agency, in which it has a continuous $5,000 overdraft. Any excess funds in this account are transferred out of the United States.

BNST also maintains a bank account in Boston in its capacity as trustee of a British unit trust. Affidavit of Edward C. Warwick, filed March 18, 1985 ¶ 7.

contacts with the forum, personal jurisdiction is proper over a non-resident defendant where the contacts with the forum amount to the carrying out of a continuous and systematic general business. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–16, 104 S.Ct. 1868, 1872–73, 80 L.Ed.2d 404 (1984) (citing *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952)). From the Cayman Islands, BNST provides a service to investors whereby the investors can buy and sell American securities on American securities exchanges. BNST conducts a substantial and regular business in this country, by any measure.[10] It is of no moment that the substantial volume of securities trading BNST carries out on American exchanges is not on its own behalf. *See S.E.C. v. Gilbert,* 82 F.R.D. 723, 725 (S.D.N.Y.1979). By trading on American exchanges, BNST provides a specific and important service to its customers. BNST reasonably and correctly expects that it would enjoy the protections of the American securities laws in the event it or its clients become the victim of a fraudulent scheme. It cannot be said that BNST's contacts with the United States are so "random," "fortuitous," or "attenuated," *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958); *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984); *World–Wide Volkswagen Corp. v. Woodson, supra,* 444 U.S. at 299,

100 S.Ct. at 568, that BNST could not reasonably expect to be haled into an American court, even on an unrelated cause of action.[11]

Defendant Warwick, a citizen of the United Kingdom who resides in the Cayman Islands, is Manager–Trust Services and Company Secretary of BNST. Warwick Aff. ¶¶ 1, 6. Warwick served as a director of 4 Aquarius and of 100 Aquarius from November 15, 1978 until December 29, 1982. *Id.* ¶ 2. According to Warwick, his only contacts with the United States in connection with the management of 4 Aquarius or 100 Aquarius, other than various correspondence, telephone calls and telexes, occurred during a visit to New York City on unrelated business of BNST in November 1978. While in New York, Warwick received a telephone call from defendant Ellis, asking him to contact defendant Wyckoff. On Ellis' instructions, Warwick executed in New York promissory notes issued by 4 Aquarius, and he delivered the notes to Wyckoff. *Id.* ¶¶ 3–5.

The execution of these notes is at the heart of the scheme alleged by plaintiffs. *See* Amended Complaint ¶ 55. Plaintiffs' cause of action, then, arises out of and is related to this contact with the forum. But even if it could be said that Warwick's execution of the notes in New York was so "random," "fortuitous" or "attenuated" that Warwick could not on that basis have reasonably expected to be haled into court here, still the Court may properly assert

---

**10.** The absence of an office or employees in the United States does not prevent this Court from asserting personal jurisdiction over BNST. As the Supreme Court recently observed:

> Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.

*Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985). This observation is particularly apt where the nature of the business in question, as in the instant case, is financial services.

**11.** To support its contention that the Court lacks personal jurisdiction over it, BNST cites *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974 (2d Cir.), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975), where the Second Circuit upheld the district court's determination that it lacked personal jurisdiction in a securities fraud action over a Canadian investment house. As described by the Second Circuit, the defendant's contacts with the United States consisted only "of buying and selling for Americans securities traded on Canadian markets and arranging with American brokers for its Canadian customers to buy or sell securities traded in American markets." 519 F.2d at 998. It appears from the foregoing description that the defendant's activities in *Bersch* were sporadic and incidental, not at all akin to the $49,000,000 custodial securities account that BNST maintains in the United States.

personal jurisdiction over Warwick based on his activities outside the forum in connection with the management of 4 Aquarius and 100 Aquarius.

Warwick undertook the management of 4 Aquarius and 100 Aquarius knowing that the purpose of the companies was to invest in American securities, and that the beneficial owners of 4 Aquarius, the Perez–Rubios, were United States residents. Warwick was engaged by Ossorio and Wyckoff, both of whom were based in New York. Thus, Warwick knew or had good reason to know, that his conduct would have effects in the United States. By undertaking the management of the Aquarius companies, Warwick should reasonably have anticipated being haled into a United States court. This is not a case where the unilateral activity of others forms the basis of the defendant's asserted contact with the forum. *Compare Hanson v. Denckla, supra,* 357 U.S. 235, 78 S.Ct. 1228 (defendant trustee's only connection with forum resulted from settlor's decision to exercise her power of appointment there). Rather, in the instant case, when Warwick undertook and continued to carry out his responsibilities, he was fully aware that he was managing funds for investment on American securities exchanges and for the benefit, at least in part, of United States residents.

Defendant Pritchard, a citizen of the United Kingdom who resides in the Cayman Islands, is an Assistant Manager of BNST. Affidavit of Kenneth K. Pritchard, filed March 18, 1985 ¶¶ 1, 6. He served as a director of 4 Aquarius and 100 Aquarius, and as secretary of both companies, from November 15, 1978 until June 22, 1982. There is no assertion that Pritchard was ever physically present in the United States in connection with the management of 4 Aquarius or 100 Aquarius. Nevertheless, because Pritchard, like Warwick, knew or had good reason to know that his conduct in connection with the Aquarius companies would have effects in the United States,

this Court may properly assert personal jurisdiction over him.[12]

### 2. *The Conyers Dill Defendants*

■ Conyers Dill is a Bermuda partnership and law firm with its principal place of business in Hamilton, Bermuda. It does not maintain an office, regularly conduct business, or promote itself in the United States, and it is not licensed to practice law in this country. Affidavit of Frank B. Smedley, filed November 20, 1985 ¶ 4 ("Smedley Aff."). The individual partners of Conyers Dill named as defendants in this action, H.C. Butterfield, Charles T.M. Collis, C.F. Alexander Cooper, Nicholas B. Dill, Jr. and John A. Ellison, are each British subjects resident in Bermuda. None is a resident in the United States, nor is any of them admitted to practice law in any of the United States. *Id.* ¶ 5. Plaintiffs have alleged, and have not been contradicted, that Butterfield served as director and president of both Aquarius 4 and Aquarius 100. Collis served as a director and vice president of both Aquarius 4 and Aquarius 100. Cooper served as a director of both companies. Dill served as liquidator of both Aquarius 4 and Aquarius 100. Ellison served as an alternate director of both companies. Butterfield, Collis, Cooper and Ellison each was the registered owner of one share of both Aquarius 4 and Aquarius 100. Amended Complaint ¶ 6(E).

North Rock Enterprises Limited ("North Rock") and Pembroke Company Limited ("Pembroke") are Bermuda corporations with their principal places of business in Bermuda, the stock of which is ultimately owned by Conyers Dill. Neither North Rock nor Pembroke maintains any office, promotes itself, or regularly conducts any business in the United States. Smedley Aff. ¶ 6. According to plaintiffs, North Rock, under the supervision of Conyers Dill, provided management services to Aquarius 4 and Aquarius 100. Pembroke, according to plaintiffs, was at all relevant times the registered owner of 11,996 of the

---

**12.** This same rationale provides an alternative basis for the assertion of personal jurisdiction over BNST itself.

12,000 outstanding shares of Aquarius 4. Amended Complaint ¶ 6(E). J. Douglas Robinson, who served as North Rock's managing director, is a citizen of the United Kingdom and was at all relevant times a resident of Bermuda. Smedley Aff. ¶ 6. Plaintiffs assert that Robinson served as secretary of both Aquarius 4 and Aquarius 100.

The Conyers Dill defendants assert that their only contacts with the United States in connection with the management of Aquarius 4 or Aquarius 100 were occasional telephone calls made to the Conyers Dill defendants from the United States, fewer telephone calls made from the Conyers Dill defendants to the United States, and the occasional exchange of written correspondence with entities in the United States. This correspondence was principally with defendant Wyckoff. Smedley Aff. ¶ 7.

Nevertheless, for the same reasons set forth above in connection with the BNST defendants, this Court may properly assert personal jurisdiction over each of the Conyers Dill defendants. When the Conyers Dill defendants undertook their responsibilities in connection with the Bermuda Aquarius companies, they knew or had good reason to know, that their conduct would have effects in the United States. They were engaged by Ossorio and Wyckoff, who were based in New York. The purpose of the companies was to invest in American securities purchased on American securities exchanges. Finally, at least some of the beneficial owners of the companies were residents of the United States. Furthermore, these circumstances are not the result of the unilateral actions of others. Rather, these circumstances reflect the state of affairs at the time the Conyers Dill defendants voluntarily undertook their responsibilities in connection with the Bermuda Aquarius companies. In short, the conduct of the Conyers Dill defendants and their connection with the United States, taken as a whole, are such that they should reasonably have anticipated being haled into a United States court.

Inasmuch as the Court has determined that it may properly assert personal jurisdiction over the BNST and the Conyers Dill defendants based on their own activities, the Court need not consider plaintiffs' contention that jurisdiction may be asserted over these defendants on a conspiracy or agency theory based on the activities of Wyckoff or Ossorio in this forum.

B. *Defendants' Motions to Dismiss for Failure to State a Claim*

Defendants have moved under Rule 12(b)(6), Fed.R.Civ.P., to dismiss the complaint for failure to state a claim upon which relief can be granted. Taking the complaint's allegations as true, *Dwyer v. Regan, supra,* 777 F.2d at 827, a court may dismiss only if the complaint leaves no doubt that plaintiff "can prove no set of facts in support of his claims which would entitle him to relief." *E.g., Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985), (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

Plaintiffs have asserted claims pursuant to section 10(b) of the 1934 Act, pursuant to section 17(b) of the Securities Act of 1933 ("the 1933 Act"), and pursuant to RICO. The Court will discuss each of these claims in turn.

1. *Plaintiffs' Claims Under Section 10(b) of the 1934 Act*

■ The essential elements of a claim under section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b),[13] and under Rule 10b–5 of the Securities and Exchange Commission,

---

**13.** 15 U.S.C. § 78j provides in part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

....

(b) To use or employ, in connection with the purchase or sale of any security registered on

a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

17 C.F.R. § 240.10b–5,[14] promulgated thereunder, are: (1) damage to plaintiffs; (2) caused by reliance on defendants' misrepresentations or omissions of material facts, or on a scheme by defendants to defraud; (3) made with an intent to deceive, manipulate or defraud (scienter); (4) in connection with the purchase or sale of securities; and (5) furthered by defendants' use of the mails or any facility of a national securities exchange. *Bochicchio v. Smith Barney, Harris Upham & Co.*, 647 F.Supp. 1426, 1429 (S.D.N.Y.1986).

The magistrate recommended dismissal of plaintiffs' securities claims on three grounds. First, the magistrate was of the view that plaintiffs failed to meet the "in connection with" requirement of 10(b) claim, because the complaint fails to point to any omissions or misrepresentations that induced plaintiffs to invest with Ossorio. Report, at 17. Second, the magistrate found plaintiffs' allegations with respect to Wyckoff insufficient to establish the requisite loss causation. *Id.* at 19. Finally, the magistrate found that the Aquarius 4 account was not a security within the meaning of the federal securities laws. *Id.* at 23. The investment in Aquarius 100, though qualifying as a security, could not in this case be subject to the security laws because plaintiffs did not make an investment decision to pool their funds in Aquarius 100. *Id.* at 21–22.

**14.** 17 C.F.R. § 240.10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**15.** The moving defendants challenge the propriety of the Perez–Rubios prosecuting a derivative action on behalf of Aquarius 100, 4 Aquarius

The Court will first consider the various transactions described in the amended complaint and determine whether any of these constitutes the purchase or sale of a security within the meaning of the federal securities laws. The Court will then determine whether a fraud is alleged in connection with any of these securities transactions, and finally, whether any such fraud caused the losses claimed by plaintiffs. Only after deciding whether any primary violation is alleged can the Court assess the sufficiency of plaintiffs' aiding and abetting claims against the moving defendants.

### a. *Standing*

Only purchasers and sellers of securities have standing to bring a private cause of action under section 10(b). *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 749, 95 S.Ct. 1917, 1931, 44 L.Ed.2d 539 (1975); *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). A cause of action will not be recognized based on the mere retention of securities. *See, e.g., Blue Chip Stamps v. Manor Drug Stores, supra*, 421 U.S. at 737–38, 95 S.Ct. at 1926–27 (potential plaintiffs excluded by *Birnbaum* rule include stockholders who decide not to sell their shares). Plaintiffs[15] point to various transactions as satisfying the purchase or sale requirement: their initial investments; the promissory notes issued in exchange

and 100 Aquarius. Inasmuch as both 4 Aquarius and 100 Aquarius have now authorized this action to be taken directly in their own names, Affidavit of Daniel J. Sullivan, filed May 27, 1986 ¶ 1, defendants' arguments with respect to these Cayman Island Aquarius Companies are now moot.

With respect to Aquarius 100, the Perez–Rubios argue both that they are entitled to bring this action directly in their capacity as shareholders, and that they have complied with the requirements of Rule 23.1, Fed.R.Civ.P., entitling them to bring this action derivatively on behalf of Aquarius 100. Plaintiffs have presented sufficient evidence in support of both their theories to avoid dismissal at this time. Furthermore, it is not at all clear to the Court that the Perez–Rubios must satisfy the procedural requirements of Rule 23.1 in order to meet the standing requirement of section 10(b). Accordingly, the Court declines at this time to dismiss the action on behalf of and in the interest of Aquarius 100.

for the conflict-of-interest loans to Ossorio and Drysdale; the issuance of stock in 4 Aquarius, 100 Aquarius and Aquarius 100; the discretionary accounts opened by Ossorio on behalf of the Aquarius companies; and the underlying securities in those accounts. Plaintiffs put forth two distinct types of transactions in the underlying securities. They argue both that the ongoing transactions in the discretionary accounts and that the transfer of the underlying securities among the Aquarius accounts satisfy the purchase and sale requirement.

The term "security" is defined in section 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10), to include, inter alia, any note, stock, bond, investment contract or any instrument commonly known as security.[16] The Supreme Court has repeatedly admonished the lower courts to look at the economic reality of a transaction rather than its form, *e.g., International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 558, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979); *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 848, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975); *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967), and to interpret the statute flexibly in view of its remedial purpose, *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972); *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). The purposes of the federal securities laws are broad, including the protection of investors, *Gould v. Ruefe-*

*nacht,* 471 U.S. 701, 706, 105 S.Ct. 2308, 2311, 85 L.Ed.2d 708 (1985), and the promotion of ethical standards of honesty and fair dealing in the profession, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). On the other hand, this Court is mindful that Congress, in enacting the securities laws, did not intend to provide a federal remedy for all fraud. *Marine Bank v. Weaver,* 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982).

■ Pursuant to the statute, a purchase includes any contract to buy, purchase, or otherwise acquire. 15 U.S.C. § 78c(a)(13). Similarly, a sale includes any contract to sell or otherwise dispose of. *Id.* § 78c(a)(14). In determining whether any of the transactions put forward by plaintiffs confer standing upon them, the Court must address two questions: whether the transaction at issue constitutes a purchase or a sale, and whether the instrument involved in the transaction is a security.

In early 1975, the Perez–Rubios made an initial investment through Aquarius 4 of commercial notes bearing a face value of $270,048. Amended Complaint ¶ 26. That initial investment was followed by subsequent investments by them of $25,000, $3,495, and $100,000 in 1975 and 1976. *Id.* ¶ 27. Plaintiffs argue that each of their capital infusions into the Aquarius Companies constitutes the purchase of a security. An investment in the Aquarius Companies constitute a security if it qualifies as an "investment contract," within the meaning of 15 U.S.C. § 78c(a)(10).[17]

**16.** Section 3(a) of the 1934 Act, 15 U.S.C. § 78c(a), provides in part:

When used in this chapter, unless the context otherwise requires—

. . . .

(10) The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on

the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

**17.** Alternatively, the transfer of funds to a broker for investment may manifest a contract for

234

The Supreme Court has established a five-part test for determining whether an instrument or transaction is an investment contract.

> "[A]n investment contract ... means a contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits [4] solely from the efforts of the promoter or a third party," [*S.E.C. v.*] *Howey*, 328 U.S. [293] at 298–99 [66 S.Ct. 1100 at 1103, 90 L.Ed. 1244 (1946)], and [5] risks loss, *Marine Bank v. Weaver*, 455 U.S. 551, 557–59 [102 S.Ct. 1220, 1224–25, 71 L.Ed.2d 409] (1982).

*Department of Economic Dev. v. Arthur Andersen & Co.*, 683 F.Supp. 1463, 1472 (S.D.N.Y.1988).

There is no question that plaintiffs invested money with the expectation of profit from the efforts of others, and that they risked loss. Controversy surrounds only the question whether the Aquarius companies amount to a common enterprise. As interpreted by the courts in this Circuit, the commonality requirement is met by either horizontal commonality, where investors' funds are pooled, or by so-called narrow vertical commonality, where the fortunes of the investor and investment manager are interdependent. *E.g., Id.* at 1473; *Kaplan v. Shapiro*, 655 F.Supp. 336 (S.D. N.Y.1987); *Savino v. E.F. Hutton & Co.*, 507 F.Supp. 1225, 1236–39 (S.D.N.Y.1981).

■ To satisfy the requirement of vertical commonality, an investor must establish not only that his or her fortunes would rise with the promoter's fortunes, but also that their fortunes would fall together. *Mechigian v. Art Capital Corp.*, 612 F.Supp. 1421, 1427 (S.D.N.Y.1985).[18] None of the Aquarius companies was established in such a way that the investors' fortunes and Ossorio's fortunes were inter-dependent. In fact, it is specifically alleged that Ossorio misappropriated plaintiffs' funds for his own use. Amended Complaint ¶¶ 10, 35. Accordingly, the investments in the Aquarius Companies cannot be considered securities by virtue of any vertical commonality.

■ The circumstance that an investor uses a similar strategy for a number of separate accounts does not satisfy the requirement for horizontal commonality. The funds must actually be pooled. *Savino v. E.F. Hutton & Co., supra*, 507 F.Supp. at 1236–37. Thus, Aquarius 4 cannot be considered a security on the ground that it was managed in the same way as the other individual Aquarius companies. However, plaintiffs have alleged that the funds in the various individual Aquarius companies were pooled into Aquarius 100, and that each of the Bermuda Aquarius Companies was to have a beneficial interest in Aquarius 100 in proportion to its contribution to Aquarius 100's total assets. Amended Complaint ¶ 32. This allegation satisfies the horizontal commonality requirement with respect to any investment in Aquarius 100.

Aquarius 100 was formed in May or June of 1976. *Id.* ¶ 31. Any investment after that date augmenting the investment capital of Aquarius 100 would constitute the purchase of a security. *See Savino v. E.F. Hutton & Co., supra*, 507 F.Supp. at 1240 (investment of additional funds into a brokerage account which is a security constitutes a "purchase" of a security to the extent of the amount of the funds invested); *Troyer v. Karcagi*, 476 F.Supp. 1142, 1148 (S.D.N.Y.1979) (same). Plaintiffs have not, in their amended complaint, specifically alleged the dates in 1976 when they added funds to their Aquarius investments. At trial, plaintiffs shall have the

the purchase of securities, thus satisfying the purchase or sale requirement, even if the specific securities to be purchased are not identified by name. *Butterworth v. Integrated Resources Equity Corp.*, 680 F.Supp. 784, 787 (E.D.Va. 1988).

18. The Court declines to recognize the so-called broad definition of vertical commonality, which requires only that the fortunes of the investor be linked to the efforts of the promoter. As this Court has explained before, such an interpretation would render the commonality requirement superfluous in view of the requirement that profits be made solely by the efforts of others. *Savino v. E.F. Hutton & Co.,* 507 F.Supp. 1225, 1237 n. 11 (S.D.N.Y.1981). *Accord, e.g., Mechigian v. Art Capital Corp.,* 612 F.Supp. 1421, 1426 (S.D.N.Y.1985).

opportunity to prove that at least some of the funds were added subsequent to the formation of Aquarius 100 and that the funds increased Aquarius 100's investment capital.[19]

 Changes in the rights of a security holder can qualify as the purchase of a new security under section 10(b), where there is such a significant change in the nature of the investment or in the investment risks as to amount to a new investment. *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir.1977), *cert. denied*, 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403 (1978); *Department of Economic Dev. v. Arthur Andersen & Co.*, *supra*, 683 F.Supp. at 1477. Generally, modifications in the rights of an investor that have been anticipated by the parties will not amount to a new purchase. *Department of Economic Dev. v. Arthur Andersen & Co.*, *supra*, 683 F.Supp. at 1477 (citing *Freschi v. Grand Coal Venture*, 551 F.Supp. 1220, 1229 (S.D.N.Y. 1982)).

Plaintiffs have alleged that the transfer of their funds from Aquarius 100 to 100 Aquarius, from Bermuda to the Cayman Islands, significantly changed the nature of their investments, in that the Cayman Islands Aquarius companies were not subject to the same government regulation that protected the investors in the Bermuda Aquarius companies. Accordingly, the transfer of funds from Aquarius 100 to 100 Aquarius may constitute the purchase of a security. The opening of discretionary accounts at different brokerage houses on behalf of Aquarius 100 and 100 Aquarius may likewise constitute the purchase of a security. *Troyer v. Karcagi, supra*, 476 F.Supp. at 1148 (opening of new discretionary accounts with a new brokerage house by defendant at plaintiffs' behalf when defendant changed employers amounted to the purchase of a new investment contract).

There is no dispute that Ossorio's trading in the underlying securities on behalf of the Aquarius companies constitutes the purchase and sale of securities, including the sale of securities to fund Ossorio's conflict-of-interest loans. Defendants contend only that there was no fraud in connection with these transactions. The Court treats this argument below.

 Inasmuch as plaintiffs have adequately alleged they are purchasers of securities, they have standing to pursue their federal securities claims. They shall have the opportunity at trial to prove that their final infusion of capital in 1976 occurred subsequent to the formation of Aquarius 100, and therefore constituted an investment in a pooled discretionary account that was a security. Likewise, plaintiffs shall have the opportunity to establish that the transfer of assets from Aquarius 100 to 100 Aquarius substantially changed the risks of plaintiffs' investment, so that the transfer amounted to the purchase of a security. The opening of discretionary accounts in the name of Aquarius 100 and 100 Aquarius constituted the purchase of securities, as did all the underlying securities transactions, whether in the name of Aquarius 4, Aquarius 100, or 100 Aquarius. In view of the Court's resolution of these matters, it need not reach plaintiffs' arguments that the promissory notes issued in exchange for the conflict-of-interest loans to Ossorio and Drysdale were securities, or that the issuance of stock in the Aquarius companies constituted the purchase and sale of securities.

b. *The "In Connection With" Requirement*

Defendants argue that plaintiffs' 10(b) claim must be dismissed because plaintiffs have failed to allege that any fraud occurred "in connection with" the purchase or sale of a security. The Court will con-

---

**19.** In an affidavit filed in opposition to the instant motions, plaintiff Miguel Perez–Rubio provides the specific dates of the Perez–Rubio's investments in the Aquarius Companies. Mr. Perez–Rubio alleges that the initial $270,058 investment was made early in 1975, that the Perez–Rubio's invested an additional $25,000 on

February 18, 1975; $3,495 on October 1, 1975; and $100,000 on December 15, 1976. Affidavit of Miguel Perez–Rubio, filed July 1, 1985 ¶ 7. In deciding this motion to dismiss, however, the Court does not rely on the affidavits submitted by the parties, but only on the allegations contained in the Amended Complaint.

sider the purchase and sale transactions it has recognized above and determine whether plaintiffs have alleged fraud in connection with any of these transactions.

■ It is apparent that an alleged fraud cannot be in connection with the purchase or sale of a security if the transaction occurs prior to the fraud. The alleged fraud must be prior to or contemporaneous with the securities transaction in question. *E.g., Department of Economic Dev. v. Arthur Andersen & Co., supra,* 683 F.Supp. at 1479; *First Fed. Sav. & Loan Ass'n v. Oppenheim, Appel, Dixon & Co.,* 629 F.Supp. 427, 439 (S.D.N.Y.1986). Plaintiffs allege that Ossorio's scheme to use the assets of the Bermuda Aquarius Companies to shore up Drysdale's capital position commenced in 1976. Amended Complaint ¶¶ 35–36. The first overt act is alleged to have occurred November 26, 1976, *id.* ¶ 37, but it might fairly be inferred from the allegations of the Amended Complaint that the scheme commenced as early as May or June of that year, when defendants formed Aquarius 100, and plaintiffs' assets were pooled with the assets of other investors. *Id.* ¶ 31. The alleged scheme continued until June 15, 1982, when Ossorio announced that Drysdale would cease doing business. *Id.* ¶ 78. Clearly, then, no claim may be based on the sale of notes that funded the Perez–Rubios' initial investment in Aquarius 4 early in 1975. At this stage in the proceedings, however, the Court is unwilling to conclude that any of the later securities transactions recognized above occurred prior to the onset of the alleged scheme. Plaintiffs shall have the opportunity at trial to establish the specific date marking the onset of Ossorio's alleged scheme.

■ The connection requirement of section 10(b) is most often met by an allegation that the defendant misrepresented the value of the instrument that was bought and sold. The antifraud provisions of the federal securities laws were drafted broadly, however, and are not so limited. A cause of action is stated even where the fraud alleged is not connected to the investment value of the securities and is not the type of fraud usually associated with the sale or purchase of securities. " '[Section] 10(b) and Rule 10b–5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.' " *A.T. Brod & Co. v. Perlow,* 375 F.2d 393, 396–97 (2d Cir.1967) (quoted with approval in *Superintendent of Insurance v. Bankers Life & Casualty Co., supra,* 404 U.S. at 10 n. 7, 92 S.Ct. at 168 n. 7). Thus, in *Bankers Life,* the Supreme Court recognized a cause of action under section 10(b) where "the full market price was paid for th[e] bonds; but the seller was duped into believing that it, the seller, would receive the proceeds." 404 U.S. at 9, 92 S.Ct. at 167.

Thus, the in connection with requirement is satisfied where accomplishment of the alleged scheme is "directly related to the trading process." *United States v. Newman,* 664 F.2d 12, 18 (2d Cir.1981); *Competitive Assocs., Inc. v. Laventhol, Krekstein, Horwath & Horwath,* 516 F.2d 811, 815 (2d Cir.1975). *Accord Department of Economic Dev. v. Arthur Andersen & Co., supra,* 683 F.Supp. at 1479 (connection element requires that securities transaction " 'was an integral or helpful component of the fraudulent scheme.' ") (quoting *Natowitz ex rel. Lexington/56th Associates v. Mehlman,* 567 F.Supp. 942, 947 (S.D.N.Y. 1983)).

In view of the foregoing, this Court reads narrowly and in its factual context the rule articulated by the Second Circuit in *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2d Cir.1984), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190, that misrepresentations or omissions involved in a securities transaction but not pertaining to the securities themselves do not form the basis for a 10(b) claim. In *Chemical Bank,* the defendant had allegedly prepared financial statements misrepresenting the financial health of the Frigitemp Corporation ("Frigitemp"). Relying on these financial state-

ments, plaintiffs extended a large loan to Frigitemp. The loan was secured by stock in Elsters, Inc. ("Elsters"), a wholly owned subsidiary of Frigitemp. There was no allegation that the defendant misrepresented the value of Elsters or its stock. Although the pledge of the Elsters stock constituted the purchase and sale of a security, the court dismissed the claim for failure to satisfy the connection requirement. "The pledge of the Elsters stock was merely an incident in a transaction not otherwise involving the purchase or sale of securities." 726 F.2d at 944 n. 24. As the court explained, it would be anomalous to hold that a commercial bank loan procured by fraud is not within section 10(b), but that it becomes so if collateralized with a security, although no misrepresentation is alleged with respect to the collateral security. *Id.* at 944.

■ *Chemical Bank* creates no barrier to the recognition of a securities claim in the instant case.[20] The alleged securities transactions are not simply incident to the alleged fraud. Rather, the purchases and sales were integral and directly related to the accomplishment of the scheme. Plaintiffs have alleged an intricate scheme whereby Ossorio diverted funds to his own use and to the use of Drysdale through a series of securities transactions. The pooling of investors' funds into the Aquarius 100 accounts facilitated the scheme, and the transfer of funds to the Cayman Islands Aquarius Companies enabled Ossorio to evade the reporting requirements of Bermuda law. The underlying securities transactions provided Ossorio with the means for embezzling funds belonging to plaintiffs and to other investors. Through these underlying transactions, Ossorio was able to exercise control over plaintiffs' as-

sets, shield his scheme from detection and fund the conflict-of-interest loans.

The Court is mindful that section 10(b) does not provide a federal cause of action for "all breaches of fiduciary duty in connection with a securities transaction." *Santa Fe Inds., Inc. v. Green,* 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977); *Accord Pross v. Katz,* 784 F.2d 455, 458 (2d Cir.1986). Plaintiffs, however, have alleged much more. This case does not involve a simple conversion of the proceeds of a securities transaction, *compare Miller v. Smith Barney, Harris Upham & Co.,* No. 84 Civ. 4307(JFK), slip op., 1986 WL 2762 (S.D.N.Y. Feb. 27, 1986); *Bosio v. Norbay Securities, Inc.,* 599 F.Supp. 1563, 1567–68 (E.D.N.Y.1985), or of funds entrusted to a broker, *compare Crummere v. Smith Barney, Harris Upham & Co.,* 624 F.Supp. 751, 754–55 (S.D.N.Y.1985); *Smith v. Chicago Corp.,* 566 F.Supp. 66, 70 (N.D. Ill.1983), or of property that happened to involve securities, *compare Pross v. Katz, supra,* 784 F.2d at 459.

■ Defendants argue that, as a matter of law, the alleged fraud cannot be in connection with any transaction of which plaintiffs were unaware. Defendants assert that plaintiffs did not know until after the fact that their funds had been pooled into the Aquarius 100 account or that the funds were transferred to the Cayman Islands. Furthermore, defendants note, plaintiffs never were aware of any of the specific underlying securities transactions on which plaintiffs base their claim, nor were they aware of any of the discretionary accounts Ossorio opened in the name of Aquarius 100 and 100 Aquarius. Accordingly, defendants contend, none of these transactions constitutes an "investment decision" undertaken by plaintiffs and there-

---

**20.** *Chemical Bank* cannot in any way be interpreted as a repudiation of the broad connection requirement articulated in *A.T. Brod* and *Competitive Assocs.* To the contrary, the *Chemical Bank* court distinguished the prior cases in a principled way. *See* 726 F.2d at 944 n. 24. Thus, this Court does not share the doubts expressed in *Crummere v. Smith Barney, Harris Upham & Co.,* 624 F.Supp. 751, 756 (S.D.N.Y. 1985), regarding the continued viability of *Com-*

*petitive Assocs.* after *Chemical Bank.* In fact, this Court is unable to square with the applicable law the suggestion in *Bochicchio v. Smith Barney, Harris Upham & Co.,* 647 F.Supp. 1426, 1430 (S.D.N.Y.1986), that a failure to allege fraud "regarding the character or nature of the securities involved" is fatal to a 10(b) claim. Such a rule would be entirely at odds with *Bankers Life, Competitive Assocs.,* and *A.T. Brod.*

fore cannot properly form the basis of any claim under the securities laws.

Defendants' argument is without merit. If the federal securities laws applied only to those transactions personally directed by a plaintiff, then a churning claim could never be recognized. Churning, however, is firmly established as a valid claim under section 10(b). A churning claim requires, inter alia, that an investor prove that his or her broker exercised control over the account and that the investor made no investment decision with respect to the allegedly excessive trade. *E.g., Siegel v. Tucker, Anthony & R.L. Day, Inc.*, 658 F.Supp. 550, 553 (S.D.N.Y.1987); *Levine v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 639 F.Supp. 1391, 1394 (S.D.N.Y.1986).[21]

The United States District Court for the Northern District of Illinois recently recognized a federal securities fraud action where the plaintiffs had not intended to purchase securities at all. The plaintiffs had entrusted their funds to the defendant bank officer for the purchase of certificates of deposit, which are not securities. Instead, without informing the plaintiffs of the nature of the investment, the defendant used the funds to purchase short-term notes in a "fly-by-night Texas oil and gas concern," of which he was a director. *Bachmeier v. Bank of Ravenswood*, 663 F.Supp. 1207, 1211 (N.D.Ill.1987). In refusing to dismiss plaintiffs' 10(b) claim, the court held that, "whatever plaintiffs' intent, defendants' deceptive use of their funds to purchase securities gives plaintiffs standing to sue under the federal securities laws." *Id.* at 1218.[22]

Moreover, the underlying securities transactions in discretionary accounts have repeatedly been recognized as forming the basis of a valid securities claim in a variety of contexts. *E.g., Darrell v. Goodson, Parry, Manko & Costa, Inc.*, No. 78 Civ. 5945(LFM), slip op., 1980 WL 1392 (S.D.N.Y. April 11, 1980); *Troyer v. Karcagi, supra*, 476 F.Supp. at 1149. *Accord In re Catanella and E.F. Hutton and Co. Securities Litigation*, 583 F.Supp. 1388, 1413 (E.D.Pa.1984) ("Where a broker is given control of the client's portfolio, the choice of a broker is tantamount to the choice of securities.").

Accordingly, the Court concludes that the fraud alleged in the complaint was in connection with purchases and sales of securities, within the meaning of section 10(b).

#### c. The Causation Requirement

■ To make out a claim under section 10(b), a plaintiff must establish both loss causation and transaction causation. Civil liability under section 10(b) requires "causation not merely in inducing the plaintiff to enter into a transaction or series of transactions, but causation of the actual loss suffered." *Manufacturers Hanover Trust Co. v. Drysdale Securities Corp.*, 801 F.2d 13, 20 (2d Cir.) (citing cases), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1986). *Accord, Bennett v. United States Trust Co.*, 770 F.2d 308, 313 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). Transaction causation focuses on whether the alleged fraud induced the plaintiff to buy the security, while loss causation looks

---

**21.** The elements of a churning claim under the antifraud provisions of the federal securities laws are: (1) that the trading in plaintiff's account was excessive in light of plaintiff's investment objectives; (2) that the broker exercised control over the account; and (3) that the broker acted with intent to defraud or with willful or reckless disregard for the interests of his or her client. *E.g., Siegel v. Tucker, Anthony & R.L. Day*, 658 F.Supp. 550, 553 (S.D.N.Y.1987); *Levine v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 639 F.Supp. 1391, 1394 (S.D.N.Y.1986).

**22.** Although the *Bachmeier* court framed its ruling in terms of the standing requirement, it is

certainly instructive on the issue whether a securities claim may properly be based on particular securities transactions of which plaintiffs were unaware. In *Bachmeier*, the defendants had challenged not only the plaintiffs' standing, but argued that the plaintiffs' lack of consent to the purchase of the Texas notes necessarily negated any causal connection between the fraudulent acts and the purchase of the notes. 663 F.Supp. at 1215. Faced with a broad-based challenge to the sufficiency of the securities claim, the court held that the plaintiffs had adequately alleged their 10(b) claim.

at whether the fraud was responsible for the plaintiff's pecuniary injury.

■ Transaction causation can be thought of as "but for" causation, or reliance. *See, e.g., Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 92 n. 6 (2d Cir.1981); *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 380 and n. 11 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). Where the complaint alleges a failure to disclose material facts, "positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute Citizens v. United States, supra*, 406 U.S. at 153–54, 92 S.Ct. at 1472, 31 L.Ed.2d 741 (1972). Rather, proof of materiality coupled with a duty to disclose establishes "causation in fact." *Id.* Therefore, in an omission case, transaction causation, which is actually reliance, can be inferred from materiality. *See generally Madison Consultants v. Federal Deposit Ins. Corp.*, 710 F.2d 57, 65 n. 6 (2d Cir.1983); *In re Catanella and E.F. Hutton and Co. Securities Litigation, supra*, 583 F.Supp. at 1414–15.

■ There can be no question under the applicable law that plaintiffs in the instant case have adequately pleaded the causation element of their 10(b) claim. The alleged omissions were clearly material.[23] The Court can properly infer that if Ossorio had disclosed his scheme to use plaintiffs' funds for the benefit of himself and Drysdale, plaintiffs would never have permitted the securities transactions set forth above. Furthermore, plaintiffs have alleged that defendants were involved directly in the process by which their funds were diverted. *See In re Investors Funding Corp.*, 566 F.Supp. 193, 202 (S.D.N.Y.1983). The damage plaintiffs complain of must be considered a foreseeable consequence of the alleged fraud. *See Manufacturers Hanover Trust Co. v. Drysdale Securities*

*Corp., supra*, 801 F.2d at 21; *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 708 (2d Cir.1980).

### d. Aiding and Abetting Liability

■ Plaintiffs, then, have alleged all the elements of a primary violation of section 10(b) by Ossorio. In addition, plaintiffs allege that Wyckoff, the Trubin Sillcocks defendants, Kelley Drye & Warren, the Conyers Dill defendants and the BNST defendants are liable as aiders and abettors of Ossorio's securities violations. To make out an aiding and abetting claim, plaintiffs must establish, in addition to a primary violation, (1) knowledge or scienter on the part of the aider and abettor, and (2) the rendering of substantial assistance by the aider and abettor in the achievement of the primary violation. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir.1985); *Bruce v. Martin*, 691 F.Supp. 716, 723 (S.D.N.Y.1988). Where a defendant is in a fiduciary relationship with a plaintiff, an allegation of recklessness satisfies the scienter requirement for an aiding and abetting claim. *Troyer v. Karcagi, supra*, 476 F.Supp. at 1151.

■ Having reviewed the allegations in the Amended Complaint, the Court is of the view that plaintiffs have adequately alleged their aiding and abetting claims against all of the moving defendants. Plaintiffs have alleged sufficient facts for a jury to conclude that the moving defendants knew of, or but for a reckless disregard of the truth would have known of, Ossorio's scheme to defraud. Furthermore, it is alleged that by their actions and by their failures to carry out their duties to plaintiffs and to the other beneficial owners of the Aquarius investments, the moving defendants provided substantial assistance to Ossorio in the accomplishment of

---

**23.** Plaintiffs have alleged that defendants made several material omissions, including: (1) that Drysdale was having financial difficulties; (2) that their investments were part of a pool that was making large loans to Drysdale and/or Ossorio; (3) that these loans were of no benefit to the Perez–Rubios or to other beneficial owners of the Aquarius Companies and, in fact, placed their investments at serious risk; (4) that

the protections normally provided to their investments by statute, regulations and exchange rules had been waived; or (5) that none of the defendants had ever seen any credible evidence that the investments of the Perez–Rubios and the other beneficial owners of the Aquarius Companies were secure. Amended Complaint ¶ 59.

his scheme. *See First Fed. Sav. & Loan Assoc. v. Oppenheim, supra,* 629 F.Supp. at 443 ("alleged actions had the cumulative effect of helping to prevent the plaintiffs and others from discovering [Ossorio's] fraud and thus were a substantial cause of the perpetuation of [Ossorio's] fraud").

Inasmuch as the Court declines to dismiss plaintiffs' 10(b) claim against the moving defendants on the aiding and abetting theory, it is not necessary for the Court to determine at this time whether plaintiffs have adequately alleged primary securities violations against the moving defendants. Such a determination can await trial on the merits.

### 2. *Plaintiffs' Claims under Section 17(a) of the 1933 Act*

■ In their Second Claim for Relief, plaintiffs allege violations of section 17(a) of the 1933 Act, 15 U.S.C. § 77q.[24] Because there is no private right of action for a claim under section 17(a), plaintiffs' second claim must be dismissed. This Court recently so held in *Eickhorst v. American Completion and Dev. Corp.,* 706 F.Supp. 1087, 1097–98 (S.D.N.Y.1989), and for the reasons therein stated adheres to that determination today.

**24.** 15 U.S.C. § 77q(a) provides as follows:
(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
(1) to employ any device, scheme or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

**25.** 18 U.S.C. § 1962 provides in part:
(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal ..., to use or invest, directly or

### 3. *Plaintiffs' RICO Claims*

Plaintiffs' third, fourth and fifth claims for relief allege violations of RICO by all defendants. Claim three alleges that each of the defendants engaged in the conduct of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). Amended Complaint ¶¶ 101–107. Claim four alleges a conspiracy among the defendants to violate section 1962(c), in violation of section 1962(d). Amended Complaint ¶¶ 108–111. Claim five alleges that the defendants received income derived from a pattern of racketeering activity, and used or invested some part or all of that income in the operation of an enterprise, in violation of section 1962(a) and/or section 1962(b).[25] Amended Complaint ¶¶ 112–115. Plaintiffs bring their RICO claims pursuant to section 1964(c), which specifically provides for a private right of action by any person injured in his or her business or property by reason of a violation of section 1962. Defendants have moved, pursuant to Rules 12(b)(6) and 9(b), Fed.R.Civ.P., to dismiss the RICO claims.

To state a cause of action under section 1962(c) a plaintiff must allege the conduct of an enterprise through a pattern of racketeering activity. *Sedima, S.P.L.R. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *Proctor &*

indirectly, any part of such income, or the proceeds of such income, in acquisition or any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce....
(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

*Gamble Co. v. Big Apple Indus. Bldgs., Inc.,* 879 F.2d 10, 14 (2d Cir.1989). A plaintiff has standing and can recover only to the extent that he or she has been injured in his or her business or property by the conduct constituting the violation. "[T]he statute requires no more than this." *Sedima, S.P.L.R. v. Imrex Co., supra,* 473 U.S. at 497, 105 S.Ct. at 3285.

The statute defines a pattern of racketeering activity as requiring "at least two acts of racketeering activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Racketeering activity, in turn, is defined to include, inter alia, fraud in the sale of securities, mail fraud, wire fraud and obstruction of justice. *Id.* § 1961(1). The magistrate recommended dismissal of plaintiffs' RICO claims on the ground that plaintiffs had not properly pleaded the requisite predicate acts of racketeering, namely violations of the federal securities laws. Report, at 26–27. Inasmuch as the Court has determined that plaintiffs have indeed pleaded violations of section 10(b) of the 1934 Act, plaintiffs' RICO claims cannot properly be dismissed on that basis.

██ With their securities fraud allegations, plaintiffs have adequately pleaded racketeering activity, within the meaning of the RICO statute.[26] It is apparent that the alleged securities fraud constitutes a pattern of racketeering, in that the alleged predicates are related, and they amount to continued criminal activity. *See H.J. Inc. v. Northwestern Bell Telephone Co.,* — U.S. ——, ——, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989) ("to prove a pattern of racketeering activity a plaintiff ... must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity"). Plaintiffs have alleged a comprehensive scheme spanning a period of six years, with common methods, a common purpose, and the involvement of each of the defendants. The allegations clearly meet the require-ments of relationship and continuity to constitute "a pattern of racketeering activity."

██ An enterprise is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity" 18 U.S.C. § 1961(4). A RICO enterprise is generally a group of persons associated together for a common purpose of engaging in a course of conduct. *Proctor & Gamble Co. v. Big Apple Indus. Bldgs., Inc., supra,* at 14. Evidence of an ongoing organization, the associates of which function as a continuing unit, suffices to prove an enterprise. *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." *Id.* Relatedness and continuity are essentially characteristics of activity rather than of enterprise. *United States v. Indelicato,* 865 F.2d 1370, 1382 (2d Cir.1989) (en banc).

Plaintiffs have alleged that "(a) Drysdale, (b) BNST, (c) Conyers Dill, (d) Kelley Drye, (e) Trubin Sillcocks, and (f) each possible combination of two or more of these" constituted an enterprise, within the meaning of section 1961(4). Amended Complaint ¶ 103. Plaintiffs have alleged that defendants, in various combinations, have associated in an ongoing organization and have functioned as a continuing unit, thus pleading an "enterprise" within the meaning of RICO.

The final element of a section 1962(c) claim is that the defendants *conducted or participated in the conduct of* the enterprise's affairs through a pattern of racketeering activity. *Proctor & Gamble Co. v. Big Apple Indus. Bldgs., Inc., supra,* at 14; *see also United States v. Indelicato, supra,* 865 F.2d at 1384 (section 1962(c) "prohibits use of a pattern of racketeering activity in the conduct of such an enterprise's affairs"). In this respect, the amended complaint is clearly sufficient to withstand a motion to dismiss. Plaintiffs

---

**26.** The Court need not consider defendants' arguments that plaintiffs have failed adequately to plead mail fraud, wire fraud, or obstruction of justice, as additional predicate acts.

have alleged that defendants carried out the affairs of the various enumerated "enterprises" through a scheme to defraud plaintiffs and other investors. Accordingly, at the present stage of this litigation, the Court declines to dismiss plaintiffs' claim three. Likewise, claim four, alleging a conspiracy among defendants to violate section 1962(c), will not be dismissed at this time.

■ Claim five, however, alleging a violation of section 1962(a) and/or section 1962(b), stands on a different footing. Subsection (a) prohibits "the use of income 'derived . . . from a pattern of racketeering activity' to acquire an interest in, establish, or operate an enterprise." *Proctor & Gamble Co. v. Big Apple Indus. Bldgs., Inc., supra,* at 14. Subsection (b) prohibits the acquisition or maintenance of any interest in or control of an enterprise through a pattern of racketeering activity. *Id.* at 14. The gravamen of plaintiffs' amended complaint is that Ossorio, aided and abetted by the remaining defendants, defrauded plaintiffs and other investors of their funds in order to shore up and to maintain the operation of Drysdale. But plaintiffs have not alleged that any of the defendants other than Ossorio himself derived income from the fraud, nor that any of defendants other than Ossorio had any interest in Drysdale. Thus, it appears that the prohibitions of sections 1962(a) and 1962(b) apply only to Ossorio, and not to any of the moving defendants. Accordingly, plaintiffs' claim five is dismissed as against the moving defendants.

## C. *Particularity of Plaintiffs' Fraud Allegations*

Various defendants assert that plaintiffs' amended complaint should be dismissed pursuant to Rule 9(b), for failure to plead fraud with the requisite particularity. These arguments relate both to plaintiffs' claims under section 10(b) of the securities laws and to plaintiffs' fraud-based RICO claims. Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent,

knowledge, and other condition of mind of a person may be averred generally." Rule 9(b) must be read in conjunction with Rule 8(a), Fed.R.Civ.P., which requires a plaintiff to plead only a short, plain statement of the claim showing that the plaintiff is entitled to relief. *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 n. 20 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). The serious nature of a charge of fraud, however, renders mere conclusory allegations that defendants acted fraudulently insufficient to satisfy Rule 9(b). *Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972); *Center Sav. & Loan Assoc. v. Prudential–Bache Securities, Inc.,* 679 F.Supp. 274, 276 (S.D.N.Y.1987).

Rule 9(b) is designed to provide a defendant with fair notice of a plaintiff's claim in order to enable the defendant to prepare a defense, to protect the defendant's reputation or goodwill from harm, and to reduce the number of strike suits. *E.g., DiVittorio v. Equidyne Extractive Inds., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). Rule 9(b) is satisfied if the complaint sets forth:

(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making the same), (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants "obtained as a consequence of the fraud."

*Conan Properties, Inc. v. Mattel, Inc.,* 619 F.Supp. 1167, 1172 (S.D.N.Y.1985) (quoting *Todd v. Oppenheimer & Co.,* 78 F.R.D. 415, 420–21 (S.D.N.Y.1978)); *see also Crystal v. Foy,* 562 F.Supp. 422, 425 (S.D.N.Y. 1983) (Rule 9(b) requires a complaint to contain allegations of: "(1) specific facts; (2) sources that support the alleged facts; and (3) a basis from which an inference of fraud may fairly be drawn.").

■ Where there are multiple defendants, the complaint must disclose the specific nature of each defendant's participation in the alleged fraud. *DiVittorio v. Equidyne Extractive Inds., Inc., supra,*

822 F.2d at 1247. Furthermore, the allegations of fraud ordinarily may not be based upon information and belief. *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir.1986); *Segal v. Gordon, supra,* 467 F.2d at 608; *Leslie v. Minson,* 679 F.Supp. 280, 282 (S.D.N.Y. 1988). This pleading restriction may be relaxed, however, where the matter is peculiarly within the knowledge of the defendant. *DiVittorio v. Equidyne Extractive Inds., Inc., supra,* 822 F.2d at 1247. When pleading upon information and belief is appropriate, a plaintiff must include a statement of the facts upon which the allegations of fraud are based. *Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1004 (2d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988). Similarly, while Rule 9(b) allows "condition of mind" to be averred generally, a plaintiff must at least present those circumstances that provide a minimal factual basis for the allegations of scienter. *E.g., Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987). In other words, a plaintiff must " 'specifically plead those events' which 'give rise to a strong inference' that defendants had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Id.* (quoting *Ross v. A.H. Robins Co., supra,* 607 F.2d at 558).

▮ In the instant case, plaintiffs have alleged a comprehensive scheme to defraud with sufficient particularity to satisfy the requirements of Rule 9(b).[27] Moreover, they have specifically set forth the alleged role of each defendant to support a claim against each of them based either on primary liability or on aiding and abetting liability. Plaintiffs have set forth a sufficient factual foundation to support an inference of the existence of a fraudulent scheme, and the participation of each defendant in that scheme.

The Court will not grant defendants' motion on the ground that the bulk of the allegations are made, impermissibly, on the basis of information and belief. The amended complaint comprises fifty-nine pages and 143 numbered paragraphs. The allegations are made on information and belief, except as to paragraphs 1–4, 7, 8, 12, 21, 26, 27, 59, 60, 62, 69 and 76. Plaintiff Miguel Perez–Rubio has submitted an affidavit in which he avers that he is prepared to allege on personal knowledge the facts set forth in paragraphs 5, 6, 9, 13, 22–24, 28–34, 37–60 and 63–85 of the amended complaint. Affidavit of Miguel Perez–Rubio, filed July 1, 1985 ¶ 2. Moreover, Mr. Perez–Rubio is prepared to allege additional facts in support of his claim. *Id.* ¶¶ 4–20. In view of these submissions and the history of this case, the Court concludes that the purposes of Rule 9(b) have been amply served. Defendants have adequate notice of the nature of the claim against them, and the Court is satisfied that the instant action is not simply a strike suit intended to extract its nuisance or settlement value from defendants. Accordingly, the Court declines to dismiss the amended complaint for failure to plead fraud with particularity.

Defendants' remaining contentions are without merit. In the exercise of its discretion, the Court will retain jurisdiction over plaintiffs' state law claims, in accordance with the principles of pendent jurisdiction.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are granted to the ex-

---

**27.** Though plaintiffs in their amended complaint accuse Ossorio of churning various accounts, they have not made out a churning claim with the specificity required by Rule 9(b). To state a churning claim under section 10(b), a plaintiff must allege "(1) that the trading in his account was excessive in light of his investment objectives; (2) that the broker exercised control over the account; and (3) that the broker acted with intent to defraud or with willful or reckless disregard for the interests of his client." *E.g., Siegel v. Tucker, Anthony & R.L. Day, Inc., supra,* 658 F.Supp. at 553. In addition, in order to properly plead the elements of a churning claim with the specificity required by Rule 9(b), the complaint also must set forth (1) the nature, amount and date of the securities in question, and (2) facts sufficient to permit the calculation of the turnover rate of the account and/or the percentage of the account value paid in commissions. *Id.* at 554. Plaintiffs have failed to do so. Absent a further amendment of the complaint to perfect plaintiffs' churning allegations, plaintiffs at trial may not present a churning claim per se, though they will be able to present evidence of manipulation of their accounts to prove the alleged fraudulent scheme.

244

tent that plaintiffs' claim two is dismissed, and plaintiffs' claim five is dismissed as against the moving defendants. In all other respects, defendants' motions are denied. The parties are directed to complete discovery by December 11, 1989, and to serve and file a joint pretrial order on or before January 26, 1990.

It is so ordered.