**John M. STEWART, et al., Plaintiffs,**

v.

**GNP COMMODITIES, INC.,
1211 Corporation, et al.,
Defendants.**

Nos. 88 C 1896, 91 C 2635.

United States District Court,
N.D. Illinois,
Eastern Division.

March 29, 1994.

Constantine John Gekas, Adrianne S. Harvitt, Harvitt & Gekas, Ltd., Chicago, IL, Bruce S. Feder, Feder Law Office, Phoenix, AZ, for plaintiffs.

Howard J. Roin, Andrew S. Marovitz, Mayer, Brown & Platt, Chicago, IL, for defendant 1211 Corp.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

Plaintiffs are investors who purchased interests in certain commodity pools operated by Waters, Tan & Co. ("Waters Tan"). Defendant, G.H. Miller & Co. ("Miller"), is a Futures Commission Merchant ("FCM").

### Statutory and Regulatory Provisions

The Commodity Futures Trading Commission ("Commission" or "CFTC") regulates the operation of commodity pools, FCMs and a host of other functions involved in the commodity markets. *See* 7 U.S.C. § 1 *et seq.* ("Commodity Exchange Act" or the "Act"); and 17 CFR § 1 *et seq.* ("Regulations"). A commodity pool operator is defined in the Act and Regulations as any

> person engaged in a business which is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection wherewith, solicits, accepts, or receives from others, funds, securities or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery or commodity option....

7 U.S.C. § 1a(4); 17 CFR § 1.3(5)(cc). Thus, the Act and Regulations permit a pool operator to receive money from his customers. Pool operators are required to register with the National Futures Association ("NFA"). 17 CFR § 3.

The Act and Regulations also define a Commodity Trading Advisor as a person who, for compensation or profit, is in the business of advising others in the trading of commodity futures or options. 7 U.S.C. § 1a(5).

The Act and Regulations define an introducing broker as

> any person ... engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market who does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

7 U.S.C. § 1a(14); 17 CFR § 1.3(mm). Therefore, under the Regulations and the Act, an introducing broker is not permitted to accept money from clients. Introducing brokers are also required to register with the NFA.

A "Futures Commission Merchant" ("FMC") is also defined by the Act and Regulations to include anyone engaged in the solicitation or acceptance of orders for purchase of commodity futures but with the important difference that the FMC is permitted to accept "money, securities, or property" in return for the purchase. 7 U.S.C. § 1a(12); 7 CFR § 1.3(p).

The Regulations require an introducing broker, as a condition of registration, to meet certain minimum financial requirements or, in the alternative, furnish a written guarantee agreement executed by the FCM for whom he works. 17 CFR § 1.17; § 1.10(a)(ii)(C) and (j). The form of the guarantee agreement is specified by regulation. (17 CFR § 1.3(nn)).

### FACTS

In 1982, Dennis K. Tan ("Tan"), and his partner, John Waters ("Waters"), started an investment club. By mid–1983, the club had begun to lose money, a fact which Tan and Waters hid from their investors by the artifice of sending false reports. They obtained money to fund the withdrawal of a club member by soliciting new customers. In 1984, in order to raise more money, they organized their first commodity pool. From November 8, 1984 until September 30, 1985, they formed additional pools and registered them with the NFA under the corporate name of Waters, Tan and Co. Waters Tan was also registered as a commodity trading advisor.

As an associated person ("AP"), Tan was personally involved in all aspects of the Waters Tan commodity pools, including the organization, advertisement, trading, and operation. He solicited investors, made trading decisions, and physically received investment funds from customers.

In May of 1985, Tan registered with the NFA as an introducing broker for Miller. To fulfill the financial requirements of the Regulations, Tan furnished the NFA with a written guarantee executed by Miller.

The guarantee agreement stated in relevant part:

> In consideration for the introduction of customer and option customer accounts by Dennis K. Tan, an introducing broker, to G.H. Miller & Co., a futures commission merchant ... the future commission merchant guarantees performance by the introducing broker of, and shall be jointly and severally liable for, all obligations of the introducing broker under the Commodity Exchange Act, as it may be amended from time to time, and the rules, regulations and orders which have been or may be promulgated thereunder with respect to the solicitation of and transactions involving all customer and option customer accounts the introducing broker entered into on or after the effective date of this agreement.

This agreement was in effect until terminated by mutual consent on July 18, 1986. Some of the material used by Waters Tan to promote its commodity pools stated that Waters Tan was an introducing broker for Miller. This was incorrect and there was no creditable evidence that Miller acquiesced in this deception. It was not until 1986, after Tan ceased to be an introducing broker for Miller and the termination of the guarantee, that Waters Tan itself became registered as an introducing broker, but for a FCM other than Miller.

In 1988, the Commission shut down the Waters Tan commodity pool operation for reasons of fraud. The NFA charged Tan and Waters personally with fraud and expelled them in 1988. In 1989, Tan was charged by the state of Arizona with criminal racketeering for his activities in operating the commodity pools, charges to which he pleaded guilty in 1989.

Plaintiffs have all lost money as a result of the frauds associated with the commodity pools operated by Waters Tan. All of the plaintiffs made payments directly to and received certificates from Waters Tan and none made any payments to Tan individually. None of the plaintiffs placed any trades directly with Miller either through Tan or otherwise. Both Tan and Waters testified that they made an effort to conceal the existence and operation of the pools from Miller.

Plaintiffs have now sued Miller on the guarantee for the money they lost through Tan's fraud. Miller has moved for summary judgment.

## ARGUMENT

Plaintiffs' position is straight forward: they made investments with Tan. He defrauded them and they lost money as the result of his fraud. A guarantee agreement existed between Miller and Tan. Therefore, Miller should make good their losses. Miller, however, contends that it only guaranteed Tan's actions as an introducing broker and not for his actions as a pool operator. Therefore, the guarantee did not cover the complained of activities.

Under section 4 of the Act, Miller as a FCM, is strictly liable for the actions of its introducing brokers provided they are within the scope of their office. 7 U.S.C. § 4; *Rosenthal & Co. v. Commodity Futures Trading Comm'n*, 802 F.2d 963, 969 (7th Cir.1986). This obligation is reinforced by the terms of the guarantee agreement which makes Miller strictly liable for the actions of its introducing broker "with respect to the solicitation of the transaction of involving all customer and option customer accounts of the introducing broker" entered into during the term of the agreement. The issue, therefore, presented by the motion is whether the acknowledged fraud of Tan was within the scope of Tan's office as Miller's introducing broker and within the terms of the guarantee.

A guarantee is a contract and is to be construed, like other contracts, according to the intention of the parties as ascertained from the instrument itself, in light of surrounding circumstances at the time it was executed. *Cargill v. Buis,* 543 F.2d 584, 587 (7th Cir.1976). Both sides agree that the terms of the guarantee are unambiguous but have differing interpretations. Plaintiffs cite *Rosenthal* while Miller cites two cases from the Commission itself: *Taylor v. Vista Futures, Inc.,* Comm.Fut.L.Rep. (CCH) ¶ 25,165 (Nov. 20, 1991), and *Hazen v. Waters, Tan & Co., et al.,* CFTC Docket No. 88–R356.

Initially, the court notes that the terms of the guarantee agreement are dictated by the Commission Regulations (*See* 17 CFR § 1.3(mm)) and it is well settled that an "agency's construction of its own regulation binds a court in all but extraordinary cases." *Homemakers North Shore, Inc. v. Bowen,* 832 F.2d 408, 411 (7th Cir.1987).

*Vista,* similar to this case, involved an introducing broker (Vista Futures) and its branch manager,[1] who were both guaranteed by a FCM. The branch manager, like Tan here, was operating a commodity pool on the side in addition to introducing customers to the FCM. After the branch manager converted funds invested in the pool, the pool investors sued the FCM on the guarantee. The Commission, in overruling the Administrative Law Judge ("ALJ"), established a distinction between the solicitation of orders and the solicitation of funds. Since by statute and regulation an introducing broker (and its associated persons) cannot solicit funds, the fraudulent activity, because it involved solicitation of funds, was found to be outside the scope of the office of introducing broker.

*Hazen* was a decision by an ALJ arising out of this very case and involved Tan and the same guarantee agreement executed by Miller, but different claimants. The ALJ held that Miller was not vicariously liable for those losses arising from investments in the Waters Tan commodity pools because Waters Tan was not its introducing broker.

In *Rosenthal,* the Commission (affirmed by the Seventh Circuit), found a FCM criminally responsible under section 4 for fraudulent activities of a commodity pool operator who was also its branch manager, *i.e.,* an AP of the FCM.[2] The FCM had entered into an arrangement with the pool operator so as to permit the FCM to share commissions on the pool investments. In soliciting customers for his commodity pool, the AP pool operator withheld required warnings about the risky nature of commodity speculation. The Commission determined this to be a form of commodity fraud. The Commission further found that the fraud was within the scope of the agency even though the fraud was committed while soliciting customers for the commodity pool rather than for the FCM. The Seventh Circuit upheld the Commission stating that

> some deference must be paid to the special knowledge which the commission brings to the regulation of the commodities markets . . . .

> \*   \*   \*   \*   \*   \*

> The commission has deemed [the associated person] an agent of [the FCM] in soliciting investors through fraudulent means not because the words "within the scope of his employment or office" ineluctably compel the conclusion that [the AP]'s agency included solicitation but because the word allow this interpretation . . . .

> \*   \*   \*   \*   \*   \*

> It had a reasonable if not compelling basis for deeming [the PA]'s acts to be within the scope of the agency created by the [FCM] and no more is required to compel us to up hold the Commission's order.

While *Rosenthal* at first blush appears to be at odds with *Vista* and *Hazen,* nevertheless, they are easily reconciled. As the Commission stated in *Vista,* a distinction is made

---

**1.** Any person associated with an introducing broker as an associate, partner, employee, or agent who is involved in any capacity in soliciting or accepting customers orders must also be registered. (7 U.S.C.A., § 6k(1)).

**2.** An associated person of a FCM must also register. (7 U.S.C.A. § 6k(1)).

between soliciting orders and soliciting funds. In *Vista*, as well as in *Hazen* (and also here), the introducing broker was hired to solicit orders and not funds. In fact, as emphasized by the Commission, the Act and Regulations prohibit introducing brokers from soliciting funds. The agent in *Rosenthal* committed the fraud through the solicitation of orders for his pool, the funds from which he intended to invest through his principal Rosenthal, which was the whole purpose behind their business relationship. The Commission and the Seventh Circuit emphasized that Rosenthal, unlike Miller, was fully aware that its agent was operating a commodity pool and soliciting funds for it. Therefore, the FCM should be encouraged to keep an eye on the methods utilized to obtain pool sales, but holding it criminally responsible.

Therefore, we have two Commission decisions, one arising out of the very same facts present here and the other out of an exceedingly similar fact situation, and a Commission decision which the Seventh Circuit stated was not "ineluctably" compelled and distinguishable. Besides, there are practical considerations supporting the reasoning in *Vista* and *Hazen* and Miller's position, which are not implicated by *Rosenthal*. The principals entered into an arrangement guaranteeing the activities of agents under which they had a right to expect would not involve the handling of money. The statute prohibited the agent from accepting money from customers. Miller could have made Tan its AP which would have allowed him to handle customer money but it chose not to do so. An arrangement that involves the handling of money is obviously riskier than one not involving the handling of money. Miller ought not have its risk increased without its knowledge. This is the basis for the Commission's decision in *Vista*. On the other hand, the arrangement between Rosenthal and its agent obviously contemplated the latter, soliciting orders which was the basis of the fraudulent charge.[3]

In addition, here, unlike *Rosenthal*, plaintiffs have brought forth no evidence that Miller was aware of Tan's involvement in the illegal pools. None of the plaintiffs purchased any futures directly from Miller. Also, unlike the branch manager in *Rosenthal*, Tan was not the pool operator and none of the plaintiffs purchased investments directly from Tan. All interests purchased by plaintiffs were from Waters Tan, the registered pool operator. All checks were sent to Waters Tan and all certificates of ownership were issued by Waters Tan. Plaintiffs, therefore, knew they were dealing with Waters Tan rather than Miller.

Plaintiffs argue that Miller is liable under the guarantee because the guarantee by its terms continued despite "subsequent incorporation, merger or consolidation" of the introducing broker. Therefore, Waters Tan, as well as Tan, is covered by Miller's guarantee. However, there was no evidence that Tan incorporated, merged or consolidated with any entity after the date of the guarantee. Waters Tan, the corporation, pre-existed the agreement. Tan was functioning in two capacities: as an AP of a registered pool operator, Waters Tan, and as an introducing broker for Miller. There is no evidence that Miller knew about Tan's role with Waters Tan, much less acquiesced in it.

■ Finally, plaintiffs claim that Miller cloaked Waters Tan with apparent authority to act as its introducing broker. The evidence in support is the declaration of a Waters Tan employee, Lee Paulus ("Paulus"). He testified that Aaron Itkin ("Itkin"), an employee of Miller, visited the offices of Waters Tan in 1986, at which time he discussed the use of the Miller name by Waters Tan. However, what Paulus failed to disclose is that three days after the visit, Itkin wrote Tan a letter confirming their discussions "concerning the use of the Waters, Tan and Company name in any manner in your promotional efforts. . . ." He further confirmed their discussion that all promotional material

> must be written under the Dennis Tan banner rather than the Waters Tan stationery. All letters to clients must likewise not be sent on Waters Tan stationery and the legend "introducing Broker for G.H. Miller & Company" must not appear

---

**3.** The agent of Rosenthal, being an AP of FCM, was entitled to receive customer funds.

in any form indicating Waters Tan as introducing for our firm.

A review of promotional materials used by Tan by the NFA was carried out subsequent to this. The NFA pointed out that the use of promotional materials listing Waters Tan as an introducing broker for Miller was not in accord with NFA compliance rules. Tan's lawyer responded to the NFA, admitting that such use was wrong and that all such offending material had been destroyed. From this evidence it is obvious that Miller did not cloak Waters Tan with apparent authority to act as its introducing broker.

## CONCLUSION

There being no issue of material fact, the motion for summary judgment of G.H. Miller & Co. is granted and the case is dismissed.

IT IS SO ORDERED.