Pat TATUM, et al., Plaintiffs,

v.

Bernie L. SMITH, III, et al., Defendants.

No. 3:93CV45–S–D.

United States District Court,
N.D. Mississippi,
Western Division.

June 5, 1995.

Grady F. Tollison, III, Tollison Austin & Twiford, Oxford, MS, for plaintiff.

Claude O. Ramer, II, Asst. Gen. Counsel, J.C. Bradford & Co., Nashville, TN, for defendant J.C. Bradford & Co.

Cynthia I. Mitchell, Merkel & Cocke, Clarksdale, MS, for defendant Howard, Weil, Labouisse, Friedrichs, Inc.

## OPINION

SENTER, Chief Judge.

In this case, plaintiffs allege that defendants violated the Commodity Exchange Act, the Securities Exchange Act, RICO, and Mississippi state law in connection with the embezzlement activities of one of the defendants. This cause is presently before the court on the motions of the defendant brokerage firms for summary judgment.

## FACTS

In 1986, the defendant Bernie L. Smith, III, opened a financial advisor and planning business—which was eventually known as Bernie L. Smith & Associates—in Oxford, Mississippi. Smith's clients included the instant plaintiffs—Pat Tatum (as trustee for Oxford Insurance Agency, Inc. Profit Sharing Plan), Waller Funeral Home, Patricia M. Miller, Dr. Winn Walcott, and Smith's parents, Bernie L. Smith, Jr., and Lucille J. Smith—who were primarily interested in making "investment[s] that grew." Towards that end, Smith invested their money in various stocks and mutual funds. He also created an investment pool, commingling their money in order to invest in a particular stock account which required a high minimum investment. At that time, Smith had no affiliation with either of the co-defendants.

In that same year, Smith also began trading commodities, both for himself and for other clients he had solicited to speculate in the commodities market. Plaintiffs were not among those clients. Smith contacted Harry Frazer, a lifelong friend who was the manager of the Clarksdale, Mississippi, office of the defendant Howard, Weil, Labouisse, Friedrichs, Inc., a commodities brokerage firm. At all relevant times, Howard Weil was registered as a futures commission merchant (FCM) with the Commodity Futures Trading Association and was a member of the Chicago Board of Trade. Frazer set up an individual account for Smith designated as "B.L. Smith, Account No. 778855," and Smith began making purchases. Smith's initial credit limit was $10,000.00, which was equal to 10 per cent of his estimated liquid net worth. Smith intended to trade a pooled account, which will be called "CAGF–Commodities" for simplicity, through this personal account. The CAGF–Commodities participants included Smith himself and other Oxford residents who are not plaintiffs in this suit. Smith maintains that Frazer knew from the outset of this arrangement and his intentions to trade with others' money. At some point, Howard Weil provided Smith with new account forms, commodities brochures, and a commodity manual and allowed Smith to use its toll free number and place orders to Howard Weil's clearing broker on the floor of the exchange.

Smith began actively trading commodities for CAGF–Commodities in the fall of 1986. He also opened a second account, "B.L. Smith–Special, Account No. 778849," which was solely a personal account and had a credit limit of $50,000.00. After four months of trading and after disbursing the proceeds of his trading activities to the CAGF–Commodities members, Smith had a realized loss of over $155,000.00.

In the spring of 1987, Howard Weil raised the credit limit for the B.L. Smith account to $750,000.00. A month later, the name of the account was changed to "B.L. Smith–A Partnership." During this same time period, Smith began the scheme which forms the basis of this action—"to cover losses in the futures account," Smith started liquidating plaintiffs' funds held in their securities accounts without their knowledge or permission. In August, Smith opened a third account with Howard Weil, "CAGF II–A Partnership," forging the names of the CAGF–Commodities participants. In September, Smith stopped trading the B.L. Smith–A Partnership account with Howard Weil and began trading with another brokerage firm, which is not a defendant in this case. He also took the Series 3 commodities futures examination to become a registered commodities broker, which he passed.

In April, 1988, Howard Weil convinced Smith to bring his business back to it. At that time, Smith became registered with the National Futures Association (NFA) as an associated person (AP) and guaranteed introducing broker of Howard Weil, which paid Smith's NFA membership dues and placed him on its personnel rolls. A few months later, Smith opened a fourth account with Howard Weil, "Bernie Smith Account No. 778859." At approximately the same time, Smith began the second wave of raiding plaintiffs' securities accounts to meet margin calls and to pay clients who were knowingly trading commodities. By the end of 1988, Smith had lost over $280,000.00 trading the fourth account.

In 1986, Smith received from Howard Weil over $5,000.00 in so-called "adjusted commis-

sions," which represented rebates of discounted commissions fees; they were not issued as separate checks. In 1987, that amount jumped to over $180,000.00, and in 1988, to over $440,000.00. During the time that Smith traded with Howard Weil, he generated 80 per cent of the revenues for the Clarksdale office.

In March, 1989, Smith and Frazer switched their commodity trading business to the defendant J.C. Bradford & Company. At that time, Smith became a guaranteed introducing broker (IB) for Bradford, a relationship which lasted until January, 1993. This was an exclusive contract, and Smith did not trade with another commodity brokerage firm during this period. As an IB, Smith solicited customers whose accounts were carried through, or "introduced to," Bradford. To assist Smith in soliciting business, Bradford provided him with new account forms and a computer link to the markets and allowed him to place orders directly to its clearing broker on the floor of the exchanges. Smith charged his commodities customers a commission on each transaction he handled for them and in turn paid Bradford a clearing fee for each trade. Bradford also paid Smith commissions for trades he executed, either by check or rebate. Over the course of their relationship, Bradford paid Smith over $655,000.00 in commissions on introduced accounts.

Smith himself also opened two individual accounts with Bradford, "B.L. Smith–Acct. No. 8980" and "Bernie L. Smith–Acct. No. 8981," through which he executed trades. Over the four-year life of these accounts, Smith lost over $830,000.00. Although Bradford expressed concerns with Smith's losses, it never ordered a halt to his trading activities. Throughout this time, Smith continued to raid plaintiffs' accounts to cover his trading losses. His fraudulent activities were revealed in January, 1993, at which time, Bradford terminated Smith's employment. Five months later, Smith pled guilty to five counts of mail fraud in violation of 18 U.S.C. § 1341 and was sentenced to 42 months in a federal corrections facility. *See United States v. Smith,* No. 3:93CR104–B (N.D.Miss.1993).

## DISCUSSION

### I. Commodity Exchange Act Claims

#### A. 7 U.S.C. § 6b

■ The anti-fraud provision of the Commodity Exchange Act (CEA) states:

> It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, *in or in connection with any order to make, or the making of, any contract of sale of any commodity . . . for or on behalf of any other person . . .* to cheat or defraud or attempt to cheat or defraud *such other person. . . .*

7 U.S.C. § 6b(a) (emphasis added). This section "mandates that the alleged fraud be 'in connection with' an order to make or the making of a 'contract of sale of any commodity.'" *Kearney v. Prudential–Bache Securities, Inc.,* 701 F.Supp. 416, 421 (S.D.N.Y. 1988). "Thus, a plaintiff must show both a transaction (the order or the making of the contract), and a link between the fraud and the transaction (that the fraud was 'in connection with' the transaction)." *Kearney,* 701 F.Supp. at 422. Therefore, "absent some indication that plaintiff made a contract of sale, no recovery is possible." *Id.* at 424. Furthermore, "[t]o satisfy the 'in connection with' requirement, plaintiff may not allege fraudulent acts which merely happened to involve commodity futures in some way." *Id.*

■ Having carefully considered the matter, the court is of the opinion that plaintiffs have failed to present any evidence which would bring them within the purview of this section—the "fraudulent acts [in this case] merely happened to involve commodity futures in some way." It is undisputed that plaintiffs were indeed "cheat[ed] or defraud[ed]" by Smith's activities, and that Smith made commodities contracts. But there is absolutely no proof that the persons being defrauded—the plaintiffs—were, as the statute requires, the same persons "for or on behalf" of whom the commodities contracts were made. The cases cited by plaintiffs are inapposite, as in each case the complaining parties knew they were trading in the com-

modities or securities[1] markets or had contracts or shares purchased in their names. *See, e.g., Saxe v. E.F. Hutton & Co.,* 789 F.2d 105 (2d Cir.1986) (plaintiff's allegation that defendants fraudulently persuaded him to engage in commodity trading by minimizing risk and puffing potential profits articulated § 6b claim); *Hirk v. Agri–Research Council, Inc.,* 561 F.2d 96 (7th Cir.1977) (plaintiff who alleged that defendants fraudulently induced him into investing in discretionary futures trading account by misrepresenting profitability of enterprise and experience of staff stated cause of action under § 6b); *Cook v. Goldman, Sachs & Co.,* 726 F.Supp. 151 (S.D.Tex.1989) (plaintiff enunciated claim under § 10(b) of the Securities Exchange Act of 1934 where he charged that he transferred money to corporation to purchase preferred stock that was never issued); *Perez–Rubio v. Wyckoff,* 718 F.Supp. 217 (S.D.N.Y.1989) (plaintiffs' knowing investment in securities was "integral and directly related to the accomplishment of [broker's] scheme" to embezzle funds; although plaintiffs articulated cause under § 10(b), court distinguished case from those involving "simple conversion of the proceeds of a securities transaction or of funds entrusted to a broker or of property that happened to involve securities"); *Butterworth v. Integrated Resources Equity Corp.,* 680 F.Supp. 784 (E.D.Va.1988) (plaintiffs wrote checks to broker which was "a clear manifestation of their intent to invest in securities," and broker's failure to invest those funds was actionable under § 10(b)); *Bachmeier v. Bank of Ravenswood,* 663 F.Supp. 1207 (N.D.Ill.1987) (bank vice-president, who was also director of "fly-by-night Texas oil and gas concern," convinced plaintiffs to transfer "conservatively invested savings into higher yield interest accounts or certificates of deposit" at bank and then used funds to purchase short-term notes in his business in plaintiffs' names; plaintiffs articulated § 10(b) claim since "purchases of securities were made because of the deceptive practices of the defendants"). Neither of those circumstances is present here. Accordingly, summary dismissal of the § 6b claim is appropriate.

## B. 7 U.S.C. § 4

■ The agency provision of the CEA states:

> For the purpose of this chapter the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

7 U.S.C. § 4. As Smith's fraudulent activities (as they involved *these* plaintiffs) were not a violation of the CEA, neither brokerage firm has any liability under § 4, regardless of their relationship to Smith.

However, assuming there was a violation of § 6b, the court nevertheless finds that the moving defendants are not liable under the CEA for Smith's actions. For Howard Weil and Bradford to be liable under § 4, plaintiffs must show that "the agent's misconduct was within the scope or (equivalently but more precisely) in furtherance of the agency." *Rosenthal & Co. v. Commodity Futures Trading Commission,* 802 F.2d 963, 966 (7th Cir.1986). Assuming arguendo that Smith was an agent of Howard Weil and Bradford (a fact Bradford accepts), his misconduct—the embezzlement of plaintiffs' money—was not within the scope of his agency. As an IB, Smith had no authority to solicit funds. *See* 7 U.S.C. § 1a(14) (an introducing broker is one who solicits or accepts orders for purchase or sale of commodities who does not accept any money). Furthermore, he never bought contracts for or on behalf of these plaintiffs, who had no intention of investing in the commodities market, and with the exception of Smith's mother (who was aware that her son, an "independent financial consultant," "transacted some of his business through J.C. Bradford"), none of the plaintiffs knew that Smith had any kind of relationship with either brokerage firm. There

---

**1.** It is well recognized that in applying § 6b of the CEA, the court should seek guidance from cases interpreting § 10(b) of the Securities Exchange Act of 1934 (SEA), an anti-fraud provision which also has an "in connection with" requirement. *See* 15 U.S.C. § 78j(b).

is, for example, no evidence that Smith orally advised his clients of his relationships with Howard Weil or Bradford, that these plaintiffs wrote checks payable to either firm, or that Smith presented plaintiffs with any business cards, stationary, or statements bearing the name of Howard Weil or Bradford. But most importantly, plaintiffs did not entrust their money to Smith based on those relationships; without exception, they testified on deposition that they authorized Smith to handle their money because he was a trusted son and friend. These undisputed facts clearly set this case apart from those cited by plaintiffs. *See, e.g., Stotler & Co. v. Commodity Futures Trading Commission*, 855 F.2d 1288 (7th Cir.1988) (court found FCM liable for acts of commodity trading advisor where advisor's clients knew their commodities accounts were being traded through FCM); *Cange v. Stotler & Co.*, 826 F.2d 581 (7th Cir.1987) (court held defendant liable for acts of agent who made unauthorized trades in plaintiff's commodities account, which he had knowingly opened with defendant); *Rosenthal & Co. v. Commodity Futures Trading Commission*, 802 F.2d 963 (7th Cir.1986) (court upheld order by Commodity Futures Trading Commission that FCM was liable for fraudulent activities of associated person (AP)[2] who failed to advise clients of risks of commodities trading)[3]. *Cf. Stewart v. GNP Commodities, Inc.*, 851 F.Supp. 283 (N.D.Ill. 1994) (distinguishing *Rosenthal*, court held that brokerage firm was not liable for fraudulent acts of IB, who solicited funds for commodity pool that he operated without firm's knowledge or consent); *FSC Securities Corp. v. McCormack*, 630 So.2d 979 (Miss.1994) (court found that broker was not vicariously liable for tortious acts of registered representative who converted investors' funds to his own use, as representative was acting outside scope of employment and investors, "although they might have ignored

it," had notice of that fact). Howard Weil and Bradford are therefore entitled to summary judgment on this claim as well.

### C. 7 U.S.C. § 25

The aiding and abetting section of the CEA provides:

> Any person ... who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to [below]. . . .

7 U.S.C. § 25(a)(1). As the case law interpreting § 25 is scanty and does not address the elements of an aiding and abetting violation, the court turns to cases decided under the SEA for guidance.

■ To establish aider and abettor liability under the CEA, then, a plaintiff must show "(1) that the primary party committed a [commodities] violation; (2) that the aider and abettor had 'general awareness' of its role in the violation; and (3) that the aider and abettor knowingly rendered 'substantial assistance' in furtherance of it." *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 621 (5th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).[4] Assuming there has been some violation of the CEA, the court nevertheless finds that plaintiffs have no evidence which sufficiently raises a genuine issue of material fact as to the second and third elements. There is absolutely no evidence that Howard Weil or Bradford knew Smith was embezzling his clients' money to cover his losses in the commodities market or that either entity otherwise aided him in his scheme in any way. These defendants are therefore entitled to summary judgment on plaintiffs' § 25 claim.

---

**2.** An AP of an FCM can accept money. *See* 7 U.S.C. §§ 1a(12) and 6k.

**3.** The court is extremely dubious of this ruling given the standard of review of the Commission's orders, *see* 7 U.S.C. § 9 (factual findings of Commission are conclusive, if supported by weight of evidence), and the appeals court's hesitant language in affirming the Commission's ruling. *See Rosenthal*, 802 F.2d at 968 and 969.

**4.** The court seeks counsel from this case, decided under the SEA, even though the United States Supreme Court has determined that a private party may not maintain an aiding and abetting suit under § 10(b) of the SEA. *Central Bank v. First Interstate Bank*, 511 U.S. —, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

## II.   Securities Exchange Act Claim

The anti-fraud provision of the Securities Exchange Act (SEA) states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance....

15 U.S.C. § 78j(b).[5] Rule 10b–5 "casts the proscription in similar terms." *Central Bank v. First Interstate Bank*, 511 U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119, 128 (1994).  Section 78t of the SEA provides for joint and several liability of "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter...."  15 U.S.C. § 78t(a).

◼ Assuming Smith's actions in inducing plaintiffs to invest in securities and in then liquidating their accounts without authorization violate the SEA, the question is whether either Howard Weil or Bradford was a controlling person within the meaning of § 78t(a).  "Control," within the meaning of the SEA, entails " 'possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.' " *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1120 (5th Cir.1980).  The Fifth Circuit has been somewhat unclear on the elements necessary to make a prima facie showing of controlling person liability, *see Abbott*, 2 F.3d at 619–20, but the court believes that, at the very least, plaintiffs at this stage of the proceedings must raise a genuine issue of material fact as to Howard Weil's and Bradford's power to control " 'the specific transaction or activity upon which the primary violation is predicated....' " *Abbott*, 2 F.3d at 620.

◼ Having carefully considered the matter, the court is of the opinion that neither Howard Weil nor Bradford is jointly and severally liable for Smith's fraudulent acts. The record is devoid of any evidence that either entity directly or indirectly controlled Smith in relation to his handling of plaintiffs' securities accounts.  Smith's relationship with the instant plaintiffs began before he had any contact whatsoever with either Howard Weil or Bradford, and even then his only contact with these brokerage firms involved commodities trading.  Furthermore, plaintiffs admit they were unaware of Smith's dealings with Howard Weil and Bradford and therefore could not have done business with Smith in reliance on those associations.  Under these circumstances, the court does not believe that plaintiffs have come forward with sufficient evidence to raise a question of fact regarding the power of these firms to control any of Smith's activities as they related to plaintiffs' securities accounts.  Howard Weil and Bradford are therefore entitled to summary judgment on this claim.[6]

### III.   RICO Claims [7]

#### A.   18 U.S.C. § 1962(a)

◼ Section 1962(a) of the Racketeer Influence and Corrupt Organization Act (RICO) provides:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... in which such person has participated as a principal within the meaning of section 2, title 18, United States Code,[8]

---

**5.**  This section corresponds to § 6b of the CEA, as discussed previously in this opinion.

**6.**  These defendants are also entitled to summary dismissal of plaintiffs' claims arising under the Mississippi Securities Act, Miss.Code Ann. 75–71–101 *et seq.*, which mirrors the federal securities act.

**7.**  The common elements of all RICO claims are "1) a *person* who engages in 2) a *pattern of racketeering activity*, 3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir.1988), *cert. denied*, 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836 (1989) (emphasis in original).

**8.**  18 U.S.C. § 2 defines a principal as one who "commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission," or who "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States."

to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). Reduced to its simplest terms, this subsection prohibits a person who has received income from a pattern of racketeering from investing that income in an enterprise. *In re Burzynski*, 989 F.2d 733, 741 (5th Cir.1993). A "pattern of racketeering activity" requires at least two predicate acts of "racketeering activity," which includes mail fraud and fraud in the sale of securities. 18 U.S.C. § 1961(1) and (5). Although there is no barrier to vicarious liability under § 1962(a), *Crowe v. Henry*, 43 F.3d 198, 206 (5th Cir.1995), for Howard Weil and Bradford to be liable under this subsection they must have participated as principals in the racketeering activity "or indirectly conducted it," *Howell Petroleum Corp. v. Weaver*, 780 F.2d 1198, 1199 (5th Cir.1986), or "derived some benefit from the agent's wrongful acts." *Crowe*, 43 F.3d at 206. Furthermore, "any injury under section 1962(a) must flow from the use or investment of racketeering income." *Parker & Parsley Petroleum Co. v. Dresser Industries*, 972 F.2d 580, 584 (5th Cir.1992).

In this case, plaintiffs have come forward with no evidence that either Howard Weil or Bradford participated in any manner in Smith's illegal activities. Although they baldly assert that all defendants "have engaged in indictable offenses," plaintiffs have absolutely no proof to support that allegation as it relates to Howard Weil and Bradford. Certainly, these defendants received funds in the form of commissions on Smith's trades, but plaintiffs' injuries do not flow from the use of those funds by Howard Weil and Bradford but from Smith's fraudulent liquidation and conversion of those funds to his own use, i.e., their injuries "do[ ] not stem from the investment of the income from the racketeering activity." *Parker*, 972 F.2d at 584. The court therefore finds that the defendants Howard Weil and Bradford are entitled to summary judgment on the § 1962(a) issue.

### B.   18 U.S.C. § 1962(c)

Section 1962(c) of RICO states:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

18 U.S.C. § 1962(c). In layman's terms, this subsection prevents a person who is employed by or associated with an enterprise from conducting the enterprise's affairs through a pattern of racketeering. *Burzynski*, 989 F.2d at 741. Under § 1962(c), the RICO "person" must be distinct from the RICO "enterprise." *Id.* at 743, and vicarious liability is nonexistent. *Crowe*, 43 F.3d at 206 n. 19. For Howard Weil and Bradford to be held liable as RICO "persons" under this subsection, as plaintiffs suggest they should be, they must have committed the predicate acts, i.e., the requisite racketeering activity. *Burzynski*, 989 F.2d at 742; *Parker*, 972 F.2d at 584. *See also Calcasieu Marine National Bank v. Grant*, 943 F.2d 1453, 1463 (5th Cir.1991). As noted in the previous section, plaintiffs have no evidence whatsoever that either Howard Weil or Bradford engaged in any racketeering activity, as that term is defined in the statute. Summary dismissal is therefore appropriate on this claim.

### IV.   Mississippi Common Law

The court has already considered the questions of agency and vicarious liability in the context of federal law and found that the moving defendants are not liable for Smith's actions taken outside the scope of any employment or agency relationship. Plaintiffs offer no further argument on those points under Mississippi law, and the court believes its previous discussion thoroughly covers these matters under state law as well.

The court likewise finds no support for plaintiffs' claim that Howard Weil and Bradford were negligent for failing to supervise Smith properly. Under *Puckett v. Rufenacht, Bromagen & Hertz, Inc.*, 587 So.2d

**926**

273 (Miss.1991), a broker has no duty to determine the suitability of a customer's trades or to prevent the customer from losing money. The Mississippi Supreme Court, in answers to questions certified from the Fifth Circuit, found that commodities brokers, such as Howard Weil and Bradford, in a non-discretionary account "only owe[ ] [their] customer [such as Smith] the duty to properly execute trades as directed by him, and ha[ve] no further duty to call upon [their] own professional skill and prudence as to the wisdom of any of [their] customer's trades." *Puckett*, 587 So.2d at 279. Furthermore, they are not "legally required to offer an umbrella of professional wisdom between contracts, detect a pattern, and advise him as to any futures trades." *Id.* See also *Puckett v. Rufenacht, Bromagen & Hertz, Inc.*, 903 F.2d 1014, 1020 (5th Cir.1990) (brokerage firm has no duty under CEA to determine customer's suitability to trade commodities).

Since Howard Weil and Bradford owed no duty to Smith, then *a fortiori* they certainly owed no duty to these plaintiffs, who were not customers of either entity. Absent any duty to them, plaintiffs cannot sustain a negligence claim against these firms. Summary dismissal of all state law claims against Howard Weil and Bradford is therefore appropriate.

### CONCLUSION

Having carefully considered the evidence, the argument of counsel, and the applicable case law, the court finds that the motions of Howard Weil and Bradford for summary judgment on all claims are well taken and granted. An appropriate order shall issue.

*ORDER GRANTING MOTIONS OF HOWARD WEIL AND J.C. BRADFORD FOR SUMMARY JUDGMENT AND DISMISSING ALL CLAIMS AGAINST THEM WITH PREJUDICE*

Pursuant to an opinion filed contemporaneously herewith, it is ORDERED:

That the motions of Howard, Weil, Labouisse, Friedrichs, Inc. and J.C. Bradford & Company for summary judgment are granted;

That all claims against these defendants are hereby dismissed with prejudice.

SO ORDERED.